UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

JEFFREY BEASLEY, ET AL.,

    Defendants.
_____/

Case No. 12-20030

Honorable Nancy G. Edmunds

**OPINION AND ORDER DENYING DEFENDANT STEWART'S MOTION TO PRECLUDE GOVERNMENT FROM USING STEWART'S TESTIMONY BASED ON AN ALLEGATION THAT STEWART BREACHED THE SEPTEMBER 28, 2010 *KASTIGAR* LETTER AGREEMENT [106]**

At a hearing held on May 15, 2014, this criminal matter came before the Court on Defendant Stewart's motion to preclude the government from using his testimony based on the government's claim that Stewart breached a September 28, 2010 Proffer Letter Agreement [106].[1] Defendant Stewart argues for the exclusion of his grand jury testimony because the government cannot prove that he was untruthful and because the results of polygraph examinations are "inherently unreliable."[2] Defendant Stewart's motion is DENIED. The parties' September 28, 2010 Proffer Letter Agreement allows the

---

[1] *See also* May 19, 2014 Order and Stipulation by parties agreeing that "it is unnecessary for the Court to conduct a hearing and hear testimony from Special Agent Bradford Beyer of the FBI on May 19, 2014." [ECF No. 223].

[2] Stewart also argues that his September 28, 2010 proffer letter agreement was invalid due to a conflict-of-interest created by Stewart's counsel at the time the letter was signed. This argument will be discussed in a separate Opinion and Order addressing Defendant Stewart's motion to dismiss, for a *Kastigar* hearing, and to suppress evidence based on conflict of interest [102].

government to use Defendant Stewart's testimony because he lied during his grand jury testimony and pre-polygraph interview and failed his polygraph examination.

**I.   Background**

As the government explains, this criminal matter arises out of an extended criminal investigation into corruption, bribery, fraud, and related activities involving the City of Detroit's General Retirement System ("GRS") and Police and Fire Retirement System ("PFRS"). The investigation that led to the Indictments in this case began with concerns about two suspicious investments by the City of Detroit Pension Boards. As the investigation continued, investigators and the grand jury became aware of additional suspicious conduct on the part of investment sponsors, Pension Board staff, Trustees, and others involving many more investments and activities of the Pension Boards. Over approximately three years, more than 120 witnesses testified before the grand jury, some did so multiple times. Federal agents conducted many more interviews and obtained and reviewed thousands of documents.

As the investigation evolved, the activities of the various individuals involved in the Pension Boards' activities came into sharper focus. Some individuals who initially did not appear to be culpable became targets as the investigation progressed and more evidence was provided. Defendant Stewart was one of those people who ultimately became a target even though he was initially considered a person who could provide truthful and complete information to the agents and the grand jury so as to shed more light on the activities of the Police and Fire Retirement System ("PFRS") for which he was an elected Trustee. Defendant Stewart is a 25-year veteran of the Detroit Police Department.

One of the Pension Board deals that triggered the criminal investigation was known

as the ICG Lease Back or ICG deal. Because Defendant Stewart initially voted against the ICG deal (Robert Shumake was the investment sponsor on that deal), Stewart was not a target of the investigation during its early stages.

On June 16, 2010, Defendant Stewart was interviewed about his knowledge of the ICG Lease Back deal. At the time, Stewart was represented by Martin Crandall and Joseph Turner, members of the Clark Hill law firm that had been retained by both City of Detroit Pension Boards in connection with the grand jury investigation.

On September 28, 2010, the government, at Attorney Crandall's request, provided Defendant Stewart with a Proffer Letter Agreement covering the terms of his anticipated testimony before the grand jury. That Proffer Letter Agreement was executed on September 28, 2010, and Defendant Stewart appeared before the Grand Jury on September 29, 2010.

### A. Terms of Proffer Letter Agreement

In the September 28, 2010 Proffer Letter Agreement, Defendant Stewart and the government agreed that: (1) Defendant Stewart would "make a complete and truthful statement of his knowledge of (and role in) the matters under investigation and to fully and truthfully answer all questions" (Gov't Resp., Ex. A, Proffer Ltr. Agree., ¶ 1); (2) Defendant Stewart would "not omit facts about crimes, other participants, or his or her involvement in the offenses, and must volunteer all information that is reasonably related to the subjects discussed in the debriefing" (*id.*); (3) if Defendant Stewart "fail[ed] to provide truthful and complete information (such as by making a false statement, providing false information, omitting facts or otherwise misleading the government), there [were] no restrictions on the government's use of any statements made by" him (*id.* at ¶ 8); (4) the government had the

3

option to require Defendant Stewart to "be given a polygraph examination to verify the truthfulness and completeness of any statement given as part of this agreement" (*id.* at ¶ 7); (5) the government had "the exclusive right to choose the polygraph examiner (*id.*); and (6) there would be "no restrictions on the government's use of any information provided or statements made in the proffer discussion," if "the results of the polygraph examination or conversations with the polygraph examiner indicate that" Defendant Stewart had "not been truthful or if" Defendant Stewart "refuse[d] to take a polygraph examination." (*Id.*)

### B. Defendant Stewart's Grand Jury Testimony

Before testifying, Defendant Stewart stated under oath that he had gone over the terms of the Proffer Letter Agreement with his attorneys, and that he understood all of its terms. (Gov't Resp., Ex. B, 9/29/10 Grand Jury Tr. Stewart Testimony at 4.) Then, when testifying before the grand jury, Defendant Stewart disclosed certain things of value that he received from a number of investment sponsors while he was a pension fund Trustee. But, the government argues, his testimony was not complete or truthful. For example, he denied receiving any cash from Shumake, other than a campaign contribution. (*Id.* at 66 -- "I'm not aware of it.") The government stresses that Defendant Stewart was specifically questioned a number of times about whether he had received any cash from Shumake. At first, Defendant Stewart denied it, then later stated that he did not recall. (*Id.* at 66 – "I'm not aware of it;" *Id.* at 105 – "I don't recall any.") Defendant Stewart testified that he would have recalled if he had received $500 or more in cash from an investment sponsor. (*Id.* at 61 – "I would think so.")

### 1. Questions About Receiving Cash

The government asked four different times generally about occasions that Defendant

4

Stewart received cash from investment sponsors.  It argues that, each time, Defendant failed to identify Shumake as someone who had given him cash.

> Q: Anyone else give you money, other than what you've already testified about, in connection with your Pension Board duties?
>
> A: I think I covered it all.
>
> \* \* \* \* \*
>
> Q: So are there any other money managers or people seeking investments with the Pension Board who gave you money, whether by cash or check, other than what you've already testified about?
>
> A: That's an open-ended statement – question, because as I stated before, when we was running as a slate, checks would come in and would be made out in my name; some would be made out to Marty's name.  So if I omit a person, it's not that I'm not trying to be forth right.  I just don't recall.
>
> Q: Why don't we exclude any monies that were given to you in connection to your election campaign to the Board of Trustees or as a union official.
>
> Excluding monies received as contributions to those campaigns, did you receive any money from anyone who had business before the Pension Board, other than what you've already testified about?
>
> A: I think we covered it all.
>
> Q: And obviously, Mr. Stewart, receiving cash in a birthday gift or an envelope, that's something you would recall; isn't that true?
>
> A: I would think so.
>
> Q: Something, $500 or more, you're going to remember getting that kind of cash, correct?
>
> A: I would think so.
>
> Q: There's no other occasions you can recall where you received money from people having business before the Pension Board?

  A:  Not at this juncture.

* * * * *

  Q:  Any other occasions when anyone gave you $500 in cash or more? I'm sorry, not just cash, also a check?

  A:  I can't recall.

(*Id.* at 60, 61-62, 63.)

### 2. Questions About Pension-Related Travel Outside United States

The government also questioned Stewart as to whether he had been on any pension-related trips outside of the United States, and he denied that he had. (*Id.* at 23-24.) Defendant Stewart testified that he had been scheduled to go on a pension due diligence trip to the Turks and Caicos Islands in the Caribbean, but that trip was cancelled because of "the Tsunamis." (*Id.* at 86-87.)

The Indictment alleges that Co-Defendant Dixon was pitching a real estate investment in the Turks and Caicos Islands to the Police and Fire Retirement System, and that Dixon gave bribes and kickbacks to Stewart and other Trustees in order to secure their support for this investment. As a result, the government argues, any foreign trips relating to the pension fund taken by Stewart were significant to its investigation.

### C. Other Witnesses Contradict Stewart's Denials of Receiving Cash and Taking Foreign Trips

The government provides the following to support its claim that Stewart's denials about getting cash from Shumake or taking any foreign trips are false.

### 1. Foreign Trips

Defendant Stewart took two pension-related trips outside the United States. First,

from March 31 to April 4, 2009, he traveled to the Turks and Caicos Islands. Stewart's credit card records establish this fact. Second, in March 2008, Defendant Stewart also traveled to the Bahamas with Bandemer, Shumake, and Stewart's mistress during a pension conference in Miami.

### 2. Receiving Cash

With regard to receiving cash from Shumake, the government argues that testimony from other witnesses and bank records show that Stewart was untruthful in denying getting any cash.

#### a. Bandemer Testimony

After Stewart testified, his close friend, partner in the Detroit police officer's union, and fellow pension Trustee, Bandemer, was questioned by the government outside the grand jury. Prior to being examined, Bandemer executed a proffer letter agreement. During his November 2010 interview, Bandemer admitted to receiving things of value from investment sponsors. Unlike Stewart, however, he told the government about how he had received $2,500 in cash from Shumake at a pension conference in New York City in late November 2007. (Gov't Resp., Ex. C, Bandemer FBI 302 at 1.) Bandemer described how Stewart, who was also attending the conference, had told Bandemer that Shumake was looking for him right before Shumake gave the $2,500 to Bandemer in the lobby of their hotel. Bandemer stated, "I want to say Stewart got some too," meaning that Stewart got some cash as well. (*Id.* at 2.) Bandemer then described to the government how, a couple of months later, Shumake gave him an additional $2,500 in cash in Boca Raton, Florida during another pension conference, attended by Defendant Stewart and Bandemer. (*Id.*)

Subsequently, in February and March 2013, Bandemer testified before the grand jury

about receiving the two $2,500 cash bribes from Shumake in New York and Boca Raton. (Gov't Resp., Ex. D, 2/27/13 Grand Jury Tr. at 41-51, Bandemer testimony; Ex. E, 3/20/13 Grand Jury Tr. at 32-33, 36-38, Bandemer testimony.) Bandemer also testified about how Defendant Stewart had met with Shumake just prior to the two times that Bandemer got cash from Shumake, and that Stewart was a closer friend of Shumake's than Bandemer was. (*Id.*, Ex. D, 2/27/13 Grand Jury Tr. at 45; Ex. E, 3/20/13 Grand Jury Tr. at 17-18, 22-23, 36-38.)

### b. Robert Shumake Testimony

In April 2011, Robert Shumake testified before the grand jury under a proffer agreement. Shumake testified that in New York City in November 2007, he gave $2,500 in cash to both Stewart and Bandemer in the lobby of their hotel. (Gov't Resp., Ex. F, 4/6/11 Grand Jury Tr. at 44, Shumake testimony.) Shumake testified that he had given the money to Stewart and Bandemer at Co-Defendant Zajac's suggestion. Zajac had told Shumake to "make nice" with Stewart and Bandemer after their earlier votes against Shumake's ICG deal. (*Id.*) Later, in December 2007, the government asserts, Defendant Stewart and Bandemer changed their positions and both voted in favor of releasing $22 million to Shumake and gave final approval to the deal.

Shumake also told the government about giving $2,500 in cash to both Defendant Stewart and Bandemer at their hotel during the pension conference in Boca Raton, Florida. Shumake had to go to a bank branch in Florida and withdraw the cash. (Gov't Resp., Ex. G, Shumake FBI 302 at 2.)

Finally, Shumake gave both Defendant Stewart and Bandemer $1,500 in cash for them to gamble on a trip to the Bahamas in March 2008. (Gov't Resp., Ex. F, 4/6/11 Grand

Jury Tr. at 67, Shumake testimony; Ex. G, Shumake FBI 302 at 1.)

### c. Bank Records

Bank records show that Shumake withdrew $5,000 in cash in Florida during the Boca Raton conference. (Gov't Resp., Ex. H.)

### D. Defendant Stewart Fails a Polygraph Examination

Based on the evidence gathered during the course of its investigation, the government believed that Defendant Stewart was untruthful in his grand jury testimony. In January 2011, the government notified Stewart's counsel, Martin Crandall, that Stewart had become a target of the grand jury's investigation. Stewart then retained attorney Jeffrey Collins as his counsel.

At a meeting with Defendant Stewart and attorney Collins, the government confronted Stewart with the fact that he had lied when he denied receiving cash from Shumake.

On April 5, 2011, pursuant to the parties' Proffer Letter Agreement, the government then requested that Defendant Stewart take a polygraph examination. (Gov't Resp., Ex. I, 4/5/11 ltr. to Collins.)

On April 20, 2011, Defendant Stewart appeared at the Detroit offices of the FBI to take the polygraph. (Gov't Resp., Ex. J, 4/20/11 Polygraph Rpt.) During the polygraph, an FBI Special Agent and certified polygrapher questioned Defendant Stewart about whether he had received cash from Shumake. The FBI polygrapher went though each of the things of value that Stewart had testified about receiving from Shumake. He then asked Stewart whether he had received any cash from Shumake in New York or Boca Raton. Defendant Stewart definitively denied receiving any such money. (*Id.* at 2, "Stewart advised that he did not receive money from Shumake in connection with Stewart's trip to New York in or

about November 2007;" "Stewart added that he definitely did not receive $2,500 from Shumake as Shumake claims" in Florida; and Stewart "later stated that he did not receive any money from Shumake during his 2008 Florida trip.")

After Stewart's polygraph examination, the FBI polygrapher determined that Defendant Stewart had failed. (*Id.* at 1, 3.) The FBI polygrapher also determined that Defendant Stewart had attempted to employ countermeasures during the course of the examination in order to defeat the test. (*Id.* at 3.)

## II. Analysis

Defendant Stewart argues that the government should be barred from using his grand jury testimony because it cannot prove that he was untruthful and because the results of polygraph examinations are inherently unreliable and thus should not be considered. The government argues the opposite – that when Defendant Stewart lied during his grand jury testimony and during his pre-polygraph interview, he substantially and materially breached the parties' September 28, 2010 Proffer Letter Agreement. The government further argues that, independent of Stewart's breach for lying, the Proffer Letter Agreement also allows it to use his testimony because he failed his polygraph examination. This Court begins its analysis with the government's breach argument.

### A. There Was a Substantial and Material Breach

The government asserts that Defendant Stewart breached his Proffer Letter Agreement by making false statements to the grand jury and the FBI during his polygraph interview. This Court is convinced that the government has met its burden by showing that Stewart's false statements and material omissions constitute a substantial and material breach of his Proffer Letter Agreement.

1. **Legal Principles**

It is well-established in the Sixth Circuit how the Court is to address an alleged breach of an immunity agreement:

> To secure a defendant's cooperation in a criminal investigation, the government may informally grant him immunity in exchange for his testimony. An agreement not to prosecute is contractual in nature, and subject to contract law standards. The conditions which will constitute a breach of the immunity agreement are governed by the agreement itself. If a firm agreement has been entered into, the government bears the burden of proving that the defendant failed to satisfy his part of the deal.

*United States v. Fitch*, 964 F.2d 571, 574 (6th Cir. 1992) (internal citations omitted). The *Fitch* court also held that the government must not only prove a breach, but must also prove that the breach was material and substantial. *Id.* The significance of a breach is measured as follows:

> "Although an inadvertent omission or oversight would not rise to the level of a materially false statement so as to constitute a breach of the agreement, a bad faith, intentional, substantial omission . . . does constitute a materially false statement and thereby a breach of the agreement."

*Id.* (quoting with approval *United States v. Castelbuono*, 643 F. Supp. 965, 971 (E.D. N.Y. 1986)).

2. **Defendant Stewart's False Statements Constitute A Breach**

It is not disputed that Defendant Stewart, his then-counsel Martin Crandall, and Assistant U.S. Attorneys Kathryn McCarthy and Robert Cares executed a Proffer Letter Agreement on September 28, 2010. (Gov't Resp., Ex. A.) When he signed the Proffer Letter Agreement, Stewart agreed to "make a complete and truthful statement of his knowledge of (and role in) the matters under investigation, and to fully and truthfully answer all questions." (*Id.* at ¶ 1.) The Agreement further explained that this meant Stewart "may

11

not omit facts about crimes, other participants, or his . . . involvement in the offenses, and must volunteer all information that is reasonably related to the subjects discussed in the debriefing." (*Id.*) So, according to the plain language of the parties' Agreement, if Stewart made a complete and truthful statement of his knowledge as set out in Paragraph 1, then the government would not offer his statements against him "in the government's case-in-chief in any criminal prosecution of [Stewart] for the matters currently under investigation." (*Id.* at ¶ 2.) If, on the other hand, Stewart "fail[ed] to provide truthful and complete information (such as making a false statement, providing false information, omitting facts or otherwise misleading the government), there [would be] no restrictions on the government's use of any statements made by [Stewart] or information provided by" Stewart. (*Id.* at ¶ 8.)

Despite Stewart's assertion that he was truthful and did not lie or otherwise omit material facts during his grand jury testimony or pre-polygraph interview, the government presents convincing, undisputed evidence to the contrary. Comparing the portions of Stewart's grand jury testimony highlighted above with Bandemer's and Shumake's grand jury testimony, their FBI 302s, and Shumake's bank records, the Court finds that the government has satisfied its burden of proof. It has shown that Stewart provided false statements in his grand jury testimony and pre-polygraph interview by denying that he had received any additional cash over $500 from people having business before the Pension Board, by omitting material facts about his receipt of cash from Shumake in New York and Florida, and by denying that he took any trips outside of the United States relating to the Pension Fund.

    a. **Cash Payments from Shumake**

Shumake testified that he gave $2,500 in cash to Stewart in New York and another $2,500 in cash in Boca Raton in order to "make nice" with Stewart after Stewart voted against Shumake's deal presented to the Pension Board. Shumake also gave $1,500 in cash to Stewart during their trip together to the Bahamas. Shumake gave identical $2,500 payments of cash to Stewart's close friend and travel companion Bandemer in New York and Boca Raton. Bandemer's grand jury testimony and Shumake's bank records corroborate Shumake's testimony.

As the government persuasively argues, any claim by Stewart that he simply forgot about the three cash payments to him by Shumake ($2,500-New York, $2,500-Boca Raton, $1,500-Bahamas) is contradicted by Stewart's statements during his pre-polygraph FBI interview. In that interview, Stewart made unequivocal denials of receiving money from Shumake in New York and Florida. He did not claim a faulty memory. Moreover, when testifying before the grand jury, Stewart indicated that he would have remembered getting cash of $500 or more. (Gov't Resp., Ex. B, 9/29/10 Grand Jury Tr. at 61.)

**b. Foreign Travel**

The government asserts that the testimony of three witnesses establishes that Stewart provided false statements when he denied taking any foreign trips relating to the Pension Fund. It presents Bandemer's and Shumake's grand jury testimony to support this claim. It also contends that Stewart's mistress has similarly testified that Bandemer and Shumake traveled with her and Stewart to the Bahamas during a pension conference in March 2008 in Miami Beach, Florida. Instead of attending pension education seminars, the government contends, this evidence shows that Stewart took a day-trip to the Bahamas on a cruise ship with Shumake, who was handling the multi-million dollar ICG investment deal with the

13

pension funds. Stewart also accepted $1,500 in cash from Shumake to pay for gambling on that trip. Contrary to the terms of his Proffer Letter Agreement, Stewart concealed this trip from the grand jury. He did the same with his March/April 2009 trip to the Turks and Caicos Islands.

In light of the above evidence, this Court finds that the government has met its burden by establishing that Stewart breached his Proffer Letter Agreement. It now considers whether that breach was substantial and material.

### 3. Stewart's Breach Was Substantial and Material

The government persuasively argues that Stewart's statements were intentionally false, and his misrepresentations and omissions were substantial and material. Stewart did not simply minimize his own actions and criminal responsibility. He also shielded the criminal activities of his close friend Bandemer, as well as the criminal activities of Shumake and Co-Defendants Zajac and Beasley. For example, Stewart, as a Trustee of the Pension Fund, initially voted to oppose the Pension Fund's investment of $22 million in Shumake's ICG deal. Within days of receiving the $2,500 in cash from Shumake in New York City, however, Stewart changed his vote; he now started voting in favor of Shumake's ICG deal. Despite Stewart's vote against the investment decision two months earlier, Stewart signed the final agreement as the Pension Fund's representative. By falsely denying that he had received money from Shumake right before changing his vote on the ICG deal, Stewart sought to conceal from the grand jury and the FBI the implication that he had changed his vote based on the money he got from Shumake. This false denial also shielded Stewart's close friend, Bandemer, who Stewart knew had also changed his vote on the ICG deal right after receiving money from Shumake in New York City. Moreover,

by lying about the trips he took to the Bahamas and the Turks and Caicos Islands, Stewart sought to conceal these other significant things of value that he received from Shumake and Co-Defendant Dixon, both of whom were marketing multi-million dollar deals to the Pension Boards.

This Court finds that the government has shown that Defendant Stewart's breach was substantial and material. His false statements intentionally concealed the *quid pro quo* that occurred when Stewart changed his vote after receiving cash from Shumake. These false statements also related directly to the criminal conduct of Shumake, Bandemer, Co-Defendant Zajac, and Co-Defendant Dixon.

Unlike in *Fitch*, the government has shown that it did not receive the "benefit of the bargain" embodied in Stewart's September 28, 2010 Proffer Letter Agreement. The government concedes that a portion of Stewart's testimony before the grand jury did provide leads about things of value being given out by investment sponsors to Pension Fund Trustees. Nonetheless, it persuasively argues that Stewart's perjury before the grand jury and his continued false denials thereafter nullified his value as a witness, especially in light of the importance of the multi-million dollar ICG deal presented by Shumake. The facts in this case are thus more akin to those in *United States v. Reed*, 272 F.3d 950, 955 (7th Cir. 2001), rather than *Fitch*.

In *Reed*, the Seventh Circuit rejected the defendant's argument that *Fitch* held that lies that are found to be benign, i.e., "do not cause the government to waste resources chasing down false leads or had otherwise hampered the government's investigation," cannot be considered a substantial and material breach of a use immunity agreement. *Id*. at 953, 955. Rather, the *Reed* court observed, "the harmlessness" of the defendant's false

statements were "but one factor in the Sixth Circuit's analysis of the asserted breach." *Id*. at 955. There were other important factors that went into the Sixth Circuit's analysis. *Id*. In *Reed*, the factor that distinguished it from *Fitch* was that Reed "also attempted to avert the government's suspicions from [another individual]," and thus Reed's violation of his use immunity agreement "denied the government the very benefit that the agreement was intended to secure – information that would aid in the identification and prosecution of other methamphetamine traffickers." *Id*. The *Reed* court succinctly stated why it found Reed's breach of his immunity agreement to be substantial and material:

> Reed's agreement, intended to be representative of a symbiotic relationship between a defendant and the government, had been reduced to a useless piece of paper that served only one of its parties. Even applying the *Fitch* analysis, Reed materially breached his immunity agreement.

*Id*.

Unlike in *Fitch*, Stewart's testimony before the grand jury was not used to secure the indictment of others. Moreover, Stewart was unwilling to cooperate by testifying at future trials against co-conspirators. In fact, the government asserts, because of Stewart's false statements, it was forced: (1) to compel Bandemer's testimony, (2) to provide a proffer letter agreement to Shumake, and (3) to compel Bandemer as a witness in order to establish that Stewart had lied in violation of his September 28, 2010 Proffer Letter Agreement in order to use Stewart's grand jury testimony at trial. Given that Bandemer was compelled to testify, the government argues, it is unlikely that it will be able to prosecute him. If, on the other hand, Stewart had been completely truthful about the money he received from Shumake, then Stewart could have been a witness in a prosecution against Bandemer and Shumake. Similarly, the government contends,

16

Stewart's testimony could have been used by the government against Co-Defendants Beasley and Zajac to corroborate Shumake's testimony against them and Co-Defendant Dixon.

More importantly, because Stewart breached his Proffer Letter Agreement by lying and omitting material facts while under oath, he undermined the purpose that Agreement and his utility as a government witness. The government entered into the Proffer Letter Agreement with the anticipation that Stewart would provide truthful information and would be a truthful witness at the trial of other individuals. Stewart's false testimony under oath rendered him unusable as a government witness and thus deprived the government of the benefit of the bargain embodied in that Agreement. *See United States v. Darwich*, No. 10-20705, 2011 WL 1336671, *6 (E.D. Mich. Apr. 7, 2011) (Cleland, J.) (concluding that "[h]ere, as in *Reed*, the Government has shown that it received virtually no benefit from Darwich's proffer and, instead, was provided with information so riven by falsehoods that Darwich's proffer, even the truthful portions, was rendered unreliable in whole, and unusable."). *See also United States v. Patrick*, 823 F. Supp. 583, 587 (N.D. Ill. 1993) (rejecting the defendant's argument that, because its effect was insignificant, his false testimony at an earlier trial was not a substantial and material breach of his plea agreement; distinguishing the facts in *Fitch*; and concluding that "[b]y testifying untruthfully in the Carlisi case, [the defendant]'s credibility and, thus, his usefulness, have been called into question in any future proceeding. As such, the government has not received the full benefit of its bargain."); *United States v. Harper*, No. 11-20188 (E.D. Mich. July 15, 2013) (Steeh, J.), ECF No. 113 at 3, (Order granting the government's motion *in* limine to admit proffer and post-polygraph statements into evidence in light of the government's evidence

from three witnesses that established that the defendant had lied when he provided statements to the contrary).

## B. Defendant Stewart Failed His Polygraph Examination

The government argues that, independent of Stewart's breach of his Proffer Letter Agreement discussed above, it is entitled to use his testimony because he failed his polygraph examination. This Court agrees.

In Paragraph 7 of the September 28, 2010 Proffer Letter Agreement, Stewart agreed that, at the government's option, he would "be given a polygraph examination to verify the truthfulness and completeness of any statement given as part" of that Agreement, and that "[t]he government shall have the exclusive right to choose the polygraph examiner." (Gov't Resp., Ex. A, 9/28/10 Agree., ¶ 7.)

In Paragraph 7, Stewart also agreed that "[i]f the results of the polygraph examination or conversations with the polygraph examiner indicate" that Stewart "had not been truthful," or if Stewart refused to take a polygraph examination, there would be "no restrictions on the government's use of any information provided or statements made in the proffer discussion." (*Id.*)

The focus of the polygraph was to determine if Stewart was being truthful when he denied that he had received any cash from Shumake. After the pre-test interview and during the polygraph examination, Stewart answered "No" to the following two questions: (1) "Were you given cash by Shumake in connection with your trips to New York or Florida?"; and (2) "Other than what we discussed, did you ever receive cash or gifts from Shumake not associated with your campaign?" (Gov't Resp., Ex. J, Polygraph Rpt. at 2.) The FBI examiner determined that the polygraph indicated that Stewart was not truthful in

those responses. (*Id.*) At the end of the examination, the FBI examiner immediately informed Stewart that he had failed, that he was not being honest about not receiving money from Shumake in conjunction with his trips to New York and Florida, and confronted Stewart about his use of countermeasures during the polygraph examination. (*Id.*)

Based on the government's evidence, this Court is convinced that Defendant Stewart failed his polygraph examination. Pursuant to the terms of the parties' Proffer Letter Agreement, the government is thus entitled to use his testimony at trial. Other federal courts considering this issue have reached a similar conclusion. *See United States v. Gillion*, 704 F.3d 284, 290-93 (4th Cir. 2012) (affirming the district court's decision that the proffer agreement the defendant signed agreeing to submit to a polygraph examination remained in effect post-indictment, was breached when the defendant left midway through the examination, and thus allowed a government agent to testify at trial about his proffered statements), *cert denied*, 133 S. Ct. 2039 (2013); *United States v. Daniels*, 189 F. App'x 199, 201 (4th Cir. 2006) (affirming the district court's decision that the defendant failed to pass his polygraph examination, breached his proffer agreement, and thus allowed the government to use his statements at his sentencing); *United States v. Walker*, No. 12-CR-20287-3, 2014 WL 1154346, *5 (E.D. Mich. Mar. 19, 2014) (finding that the defendant's refusal to sit for a polygraph examination "constituted a material and substantial breach of [his] proffer agreement.").

Despite his complaints of unfairness, Stewart agreed to take a polygraph examination if the government wanted one, and he agreed that the government had "the exclusive right to choose the polygraph examiner." (Gov't Mot., Ex. A, 9/28/10 Agree., ¶ 7.) Stewart's arguments that the results of the polygraph examination should not be admitted because

they are inherently unreliable or otherwise inadmissible are rejected. First, the government informs the Court that it is <u>not</u> seeking to introduce the results of Stewart's polygraph examination at trial. Second, even if the government were seeking to introduce those results, the Sixth Circuit recognizes that they could be admissible if there is a prior agreement between the parties allowing it. *See United States v. Sherlin*, 67 F.3d 1208, 1216-17 (6th Cir. 1995) (observing that the same is not true in the absence of a prior agreement between the parties).

### III. Conclusion

For the above-stated reasons, Defendant Stewart's motion to preclude the government from using his testimony [106] is DENIED.

<u>s/Nancy G. Edmunds</u>
Nancy G. Edmunds
United States District Judge

Dated: May 20, 2014

### CERTIFICATION

I hereby certify that a copy of the foregoing document was served upon counsel of record on May 20, 2014, by electronic and/or ordinary mail.

<u>s/Carol J. Bethel</u>
Case Manager