UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,

v.

JEFFREY BEASLEY, ET AL.,

       Defendants.

_____/

Case No. 12-20030

Honorable Nancy G. Edmunds

**OPINION AND ORDER DENYING (1) DEFENDANT STEWART'S MOTION TO DISMISS, FOR A *KASTIGAR* HEARING, AND TO SUPPRESS EVIDENCE BASED ON THE CONFLICT OF INTEREST OF HIS ATTORNEYS [102], AND (2) DEFENDANT ZAJAC'S MOTION TO DISMISS THE FIFTH SUPERSEDING INDICTMENT AND TO SUPPRESS EVIDENCE BASED UPON A CONFLICT OF INTEREST OF HIS ATTORNEYS [151]**

At hearings held on April 29 and May 15, 2014 and an evidentiary hearing held on June 3, 2014, this criminal matter came before the Court on (1) Defendant Stewart's motion to dismiss, for a *Kastigar* hearing, and to suppress evidence based on the alleged conflict of interest of his attorneys [102]; and (2) Defendant Zajac's motion to dismiss the Fifth Superseding Indictment and to suppress evidence based upon an alleged conflict of interest of his attorneys [151]. Defendants' motions raise substantially the same arguments. For the reasons discussed below, Defendants Stewart's and Zajac's motions to dismiss, to suppress evidence, and for a *Kastigar* hearing are DENIED.

## I.    Background

As the government explains, this criminal matter arises out of an extended criminal investigation into corruption, bribery, fraud, and related activities involving the City of

Detroit's General Retirement System ("GRS") and Police and Fire Retirement System ("PFRS").  The investigation that led to the Indictments in this case began with concerns about two suspicious investments by the City of Detroit Pension Boards.  As the investigation continued, investigators and the Grand Jury became aware of additional suspicious conduct on the part of investment sponsors, Pension Board staff, Trustees, and others involving many more investments and activities of the Pension Boards.  Over approximately three years, more than 120 witnesses testified before the Grand Jury, some did so multiple times.  Federal agents conducted many more interviews and obtained and reviewed thousands of documents.

In April 2009, official minutes of the PFRS Board reveal that it voted to retain Attorney Martin Crandall, an experienced criminal attorney with the Clark Hill firm, to act as "Special Counsel regarding grand jury," and to provide legal representation for the PFRS Trustees and staff in connection with the government's ongoing investigation.  Attorney Crandall subsequently provided the same Special Counsel services to GRS Trustees and staff.

As revealed from Martin Crandall's and Joseph Turner's testimony at the June 3, 2014 evidentiary hearing, based on Defendant Zajac's recommendation, the PFRS Board passed a resolution to have the Clark Hill law firm represent Board members and staff as fact witnesses before the Grand Jury.  Clark Hill attorney Martin Crandall was designated as lead counsel because he had criminal experience, having been an Assistant United States Attorney from 1979 through 1985.  Clark Hill attorney Joseph Turner was to assist Crandall and provide background on Pension Board and investment issues.  Attorney Turner had been "Special Counsel" for the PFRS since 1994 and was currently serving in that role.

In 2009 and 2010, Attorney Crandall accompanied a number of Pension Board

Trustees and staff members to interviews and/or Grand Jury appearances. Clark Hill attorney Joseph Turner frequently accompanied Crandall to those same interviews and Grand Jury appearances. Attorney Crandall estimates that he and Turner represented more than 20 witnesses (Turner estimates it was more than 30), including Trustees Stewart, Bandemer, Best, Alberta Tinsley-Talabi, Pension Board staff, Pension Board General Counsel Zajac, other policemen and firemen, and vendors. Turner testified that Defendants never objected to Crandall's or Turner's multiple representations.

**A. Defendant Zajac**

Defendant Ronald Zajac served as General Counsel to both the GRS and PFRS for more than 25 years. Zajac was initially interviewed by investigators as a person who could provide truthful information to the Grand Jury concerning the two Pension Boards' standard procedures for receiving, reviewing, and approving investment proposals.

In September 2010, Zajac was subpoenaed to appear before the Grand Jury.

On September 3, 2010, several days before his Grand Jury appearance and at Attorney Crandall's request, a proffer letter agreement[1] covering the terms of Zajac's

---

[1]Defendants Stewart and Zajac refer to this proffer letter agreement as a *Kastigar* letter. As recently observed in *United States v. Walker*, No 12-CR-20287-3, 2014 WL 1154346, *1 n.2 (E.D. Mich. Mar. 19, 2014) (Goldsmith, J.), "[t]his is incorrect." Rather, it is an informal proffer agreement.

The letter – which allows derivative use of any information provided – is an informal proffer agreement not subject to the statutory protections under which a *Kastigar* hearing is required. *See United States v. Mendizabal*, 214 F. App'x 496, 501-502 (6th Cir. 2006) (noting that an agreement allowing the government to make "derivative use" of the defendant's testimony is a classic informal-immunity agreement); *see also United States v. Turner*, 936 F.2d 221, 223-224 (6th Cir. 1991) (grant of *Kastigar* immunity must be approved by United States Attorney in relevant judicial district, a high-ranking official in the Justice Department, and a federal district judge).

testimony was executed by Attorney Crandall, Zajac, and AUSAs Robert Cares and Kathryn McCarthy. (Gov't Zajac Resp., Ex. C, Zajac 9/3/10 proffer letter agreement.) That proffer letter agreement expressly provides that "if [Zajac's] statements lead the government to develop additional evidence against [him], the government may use this derivative evidence in any manner." (*Id.* at 1, ¶ 4.)

On September 8 and September 15, 2010, Zajac testified before the Grand Jury. (Gov't Zajac Resp., Ex. A, Grand Jury Tr., Ronald Zajac testimony, 9/8/10; Ex. B, Grand Jury Tr., Robert Zajac testimony, 9/15/10.) At the June 3, 2014 evidentiary hearing, Attorney Turner testified that, prior to Zajac's testimony, neither Turner nor Crandall advised Zajac to lie or to be conveniently "forgetful" in his testimony before the Grand Jury.

During his Grand Jury appearances, Defendant Zajac testified about the general procedures followed by the two Pension Boards (*id.*, Ex. A, 9/8/10 Grand Jury Tr. at 6-10) and the function of third party marketers in Pension Board activities (*id.* at 11-21). Zajac was also questioned at length about a specific $20 million investment proposal referred to as the "CROCI deal" and about related travel to the United Kingdom, purportedly for the purpose of conducting a due diligence review of the proposal. (*Id.*, Ex. A, 9/8/10 Grand Jury Tr. at 27-71; Ex. B, 9/15/10 Grand Jury Tr. at 13-69.)

In connection with the CROCI deal, Zajac was asked about an allegation that one or more Pension Board Trustees expected or demanded free travel to London in return for supporting the CROCI deal. (*Id.*, Ex. A, 9/8/10 Grand Jury Tr. at 69.) Zajac testified that he had not heard such an allegation and responded that, "As a matter of fact, I'm offended.

---

*Id.*

4

If anybody suggested that, I'm offended by it."  (*Id.*)

Subsequently, investigators developed evidence that Zajac himself had acted as a conduit for tens of thousands of dollars in cash and other things of value that were provided to individual Pension Board Trustees on behalf of investment sponsors and the third party marketers who promoted their investment proposals.  The government states that this evidence showed that Zajac's activities included the following:  Zajac solicited some $10,000 in cash from various investment sponsors and associates who attended (or were required to attend) a party in 2007 for Trustees Paul Stewart and Martin Bandemer.  Zajac divided the cash into two envelopes of $5,000 each and delivered the so-called "birthday gifts" to Trustees Stewart and Bandemer.  Later in 2007, Zajac counseled an investment sponsor to make cash gifts to Trustees Stewart and Bandemer to ensure their support for an investment proposal pending before the PFRS Board.  None of this was addressed by either the government or Zajac during his September 8th and 15th, 2010 appearances before the Grand Jury.

In early January 2011, the government alerted Attorneys Crandall and Turner that Zajac had become a target in the investigation.  At the same time, the government alerted Crandall and Turner that Stewart and Bandemer had also become targets.  At the June 3, 2014 evidentiary hearing, Crandall and Turner testified that they immediately ceased their representation of Zajac, Stewart, and Bandemer once they learned that they had become targets of the government's investigation.  Later in January 2011, Zajac retained Christopher Andreoff to represent him.  Andreoff continued his representation of Zajac until May 2014 when current counsel was substituted in for Andreoff.  Defendant Zajac was indicted on March 20, 2013 in the Fifth Superseding Indictment.

5

### B. Paul Stewart

As the investigation evolved, the activities of the various individuals involved in the Pension Boards' activities came into sharper focus. Some individuals who initially did not appear to be culpable became targets as the investigation progressed and more evidence was provided. Defendant Stewart, like Zajac, was one of those people who ultimately became a target even though he was initially considered a person who could provide truthful and complete information to the agents and the Grand Jury so as to shed more light on the activities of the PFRS for which he was an elected Trustee. Defendant Stewart is a 25-year veteran of the Detroit Police Department.

One of the Pension Board deals that triggered the criminal investigation was known as the ICG Leaseback or ICG deal. Because Defendant Stewart initially voted against the ICG deal (Robert Shumake was the investment sponsor on that deal), Stewart was not a target of the investigation during its early stages. As described below, Stewart's status from witness (during interviews and Grand Jury testimony on September 29, 2010) to target (on January 5, 2014) did not change until several months after his September 29, 2010 testimony. Once the government determined that Stewart had provided false testimony about receiving cash payments, i.e., from Shumake, it cancelled his scheduled January 5, 2011 appearance before the Grand Jury. That same date, the government also informed Crandall and Turner about Stewart's change in status and told them that Stewart should no longer be represented by either Mr. Crandall or his law firm partner Joseph Turner. At the same time, the government also informed Crandall and Turner that Zajac and Bandemer had also become targets and would need new, separate, independent counsel. At the June 3, 2014 evidentiary hearing, Crandall and Turner both testified that they

6

immediately ceased representation of Stewart, Zajac, and Bandemer at that instant.

A more detailed description of Stewart's change in status from "witness" to "target" is set out below.

According to Turner's and Crandall's testimony at the June 3, 2014 evidentiary hearing, Crandall had arranged for the government to notify him when it was ready to subpoena a PFRS witness to testify before the Grand Jury. Generally, Crandall and/or Turner would interview the witness, accompany the witness to government interviews and to the Grand Jury where Crandall and/or Turner would be available for questions from the witness during testimony, and then would debrief the witness after his or her Grand Jury testimony.

Stewart was not the first witness to testify before the Grand Jury. Several other Trustees and Pension Board staff members had previously testified before the Grand Jury or had been interviewed with the assistance of Clark Hill attorneys Crandall and Turner.

On June 16, 2010, Defendant Stewart was interviewed about his knowledge of the ICG Leaseback deal. At the time, Stewart was represented by Crandall and Turner.

Stewart was then scheduled to appear before the Grand Jury on September 29, 2010. Crandall and Stewart met with Stewart about one week before his Grand Jury testimony. Crandall was lead counsel. He discussed with Stewart his rights before the Grand Jury. Based on that interview, Stewart's counsel had no reason to believe that Stewart would give incriminating testimony against Zajac, Bandemer, or other PFRS witnesses. There was, however, one matter that caused Crandall to go to the U.S. Attorney's office and seek a proffer letter agreement to protect Stewart. It was Crandall's decision, not Turner's. (*See* Gov't Ex. 1, 6/3/14 Evid. Hrg., 9/22/10 ltr. from Crandall.) Crandall's concerns about

7

Stewart's anticipated Grand Jury testimony arose out of Stewart's statement that he had received something that he should not have in light of his position on the PFRS Board. Crandall did not think that this constituted a bribe or a quid pro quo, but he thought Stewart needed the protection he would get from a proffer letter agreement. So, Crandall sought and obtained one. The proffer letter agreement was signed by Crandall, Stewart, and Assistant United States Attorneys Kathryn McCarthy and Robert Cares. At that time, Stewart was not yet identified as a "subject" or "target" of the government's investigation.

At the evidentiary hearing, Crandall testified that, as a defense attorney, he has represented hundreds of grand jury witnesses. If he determines that there is sensitive, incriminating evidence at issue, his goal is to offer cooperation for the exchange of some protection from prosecution. To obtain that protection, the witness must tell the government all he knows. Crandall thus seeks a proffer letter agreement as a prelude to a cooperation agreement.

On September 28, 2010, the government, at Attorney Crandall's request, provided Defendant Stewart with a proffer letter agreement covering the terms of his anticipated testimony before the Grand Jury. At the June 3, 2014 evidentiary hearing, Crandall testified that he went over the terms of the proffer letter agreement with Stewart. Crandall explained to Stewart that he must be truthful when testifying before the Grand Jury. Crandall also testified that he found Stewart to be articulate, knowledgeable, and strong-willed. Crandall did not recall that Stewart had any questions about the proffer letter agreement.

Under the terms of that letter agreement, Stewart agreed "to make a complete and truthful statement of his knowledge of (and role in) the matters under investigation." (Gov't

Stewart Resp., Ex. A, 9/28/10 proffer letter agree., ¶ 1.)  Stewart also agreed "to fully and truthfully answer all questions" before the Grand Jury.  (*Id.*)  In return, the government agreed that his statements would not be offered in its case-in-chief in any related criminal prosecution.  The parties expressly agreed that, in the event Stewart failed "to provide truthful and complete information," there would be "no restrictions on the government's use" of any statements or any information that Stewart provided.  (*Id.* at ¶ 8.)

At the June 3, 2014 evidentiary hearing, Crandall stated that, before Stewart testified before the Grand Jury, he emphasized to Stewart the need to be totally truthful and explained the negative consequences if he did not – it could lead to felony indictments for perjury, obstruction of justice, or other charges, i.e., under 18 U.S.C. §§ 1001, 1623.  He emphasized that the benchmark of protection, as stated in the proffer letter agreement, is truth; that if Stewart told the truth, he would be protected.  Turner, like Crandall, described Stewart as a bright, strong-willed individual.  He understood what Crandall told him.

On September 29, 2010, Defendant Stewart appeared and testified under oath before the Grand Jury.  At the outset of his appearance, Stewart confirmed that he understood his Fifth Amendment right not to incriminate himself:

Q:  You understand that you have a right not to answer any question that you honestly believe may tend to incriminate you or show that you're guilty of a crime.  Do you understand?

A:  Yes, sir.

(Grand Jury Tr. at 3, Paul Stewart testimony, Sept. 29, 2010.)  Defendant Stewart also confirmed that he understood the terms of his September 28th proffer letter agreement:

Q:  . . . before you signed that, did you go over the terms of that agreement

9

with your attorneys?

A: I did.

Q: And when you signed it, did you understand all of the terms of the agreement?

A: I did.

(*Id.* at 3-4.)  Defendant Stewart was also informed on September 29, 2010 that he had a right to consult with his attorney outside the Grand Jury room upon request.  (*Id.* at 4.)

During his September 29, 2010 Grand Jury testimony, Defendant Stewart testified about a number of Pension Board investments and events.  Among other things, Stewart testified that Defendant Zajac had organized a birthday party for him and another Pension Board Trustee, that Zajac had received $5,000 in cash from guests to that party as a "gift" for Stewart, and that Zajac gave that $5,000 in cash to Stewart.

Stewart also testified on September 29, 2010 that Clark Hill attorney, Joseph Turner, was a guest at that birthday party and that he could "take a guess" that Turner had contributed some unspecified amount to the "gift" because "[t]hat's the purpose of people being there."  (*Id.* at 12-14.)  In its Response, the government claims that this Grand Jury testimony was the first time that it learned about this birthday party or a similar one given for Co-Defendant Jeffrey Beasley.  (Gov't Stewart Resp. at 5.)

Crandall was not present when Stewart testified before the Grand Jury, Turner was. At the June 3, 2014 evidentiary hearing, Turner testified that no one instructed Stewart to lie or to hide facts or to avoid mentioning the January 2007 birthday party for Defendant Beasley or the August 2007 birthday party for Stewart and Bandemer.  In his testimony before the Grand Jury, Stewart confirmed this:

Q: Did anyone suggest that you should not disclose the existence of this [birthday] party?

A: Never.

Q: What did Mr. Bandemer say about the party?

A: That the party existed and that we [sic] was going to disclose it if asked.

(Grand Jury Tr. at 20-21, Paul Stewart testimony, Sept. 29, 2010.)

Before being excused from the Grand Jury on September 29, 2010, Defendant Stewart was informed that his "testimony has been given under oath. And if you've testified falsely or omitted a material fact, you could avoid a possible prosecution for making a false statement or perjury by changing or amending your testimony at this time." (Grand Jury Tr. at 119, Paul Stewart testimony, Sept. 29, 2010.) Stewart was then asked, "Is there any of your testimony that you need to change or amend?" (*Id.*) And, he replied, "No." (*Id.*)

After Stewart was finished with his Grand Jury testimony, he met with Attorney Turner. Crandall testified at the evidentiary hearing that, after Stewart testified, Crandall learned that there was a problem. Crandall returned from Ann Arbor. Crandall and Turner met with Stewart to discuss Crandall's concerns about variances in Stewart's testimony about monies he had received that Stewart had not previously revealed to Crandall and/or Turner. Immediately after talking with Stewart, Crandall contacted the U.S. Attorney's office about possible conflicts of interests, and the U.S. Attorney's office assured Crandall that Stewart was not a "target" at that time. Crandall relayed that information to Turner.

Crandall and Turner continued to represent Zajac, Stewart, and Bandemer in October, November, and December 2010. During that time period, the government never indicated that Crandall's and/or Turner's concurrent representation of multiple PFRS witnesses was

11

a problem.

In November 2010, PFRS Trustee Bandemer had a pre-Grand Jury interview with the government. Crandall and Turner represented Bandemer at that time. Turner and Crandall testified at the evidentiary hearing that, at that time, Crandall and the government discussed whether there were conflicts of interest that precluded their representation of Bandemer and concluded there were not. Crandall and Turner continued their representation of Bandemer, who was not yet identified as a target.

Turner testified at the evidentiary hearing that, as a general practice, he and Crandall dealt with each PFRS witness individually and explored possible conflicts with them and relied on the government to notify them if a conflict arose, and that had not occurred until early January 2011. Specifically, Turner and Crandall testified that they discussed with each other and spoke with the U.S. Attorney's Office about possible conflicts of interest that could arise from their joint representation of Stewart, Bandemer, and Zajac, but no one brought the matter before the Court. Crandall testified that he raised conflict issues with Stewart, Bandemer, and Zajac from time to time.

Up until early January 2011, Crandall and Turner were told that there was no actual conflict. No PFRS witness that they represented was identified as a target until January 5, 2011. The only individual they knew was a target before that time was Defendant Beasley. For that reason, neither Crandall nor Turner ever represented Beasley.

Defendant Stewart was scheduled to testify before the Grand Jury again on January 5, 2011, and Attorney Crandall was notified that Stewart would be questioned about two additional investments.

Turner testified at the evidentiary hearing that a few days before Stewart's scheduled

12

January 5, 2011 continued testimony before the Grand Jury, Stewart and Zajac went with Turner and Crandall to the U.S. Attorney's Office to review the transcripts of their earlier Grand Jury testimony.  Zajac took a long time reviewing his September 8, 2010 and September 15, 2010 Grand Jury transcripts, and Stewart did not get a chance to review his.

On January 5, 2011, before Stewart testified, another witness testified before the Grand Jury.  Based on that witness's testimony and other information (about Stewart's relationship with Robert Shumake, the investment sponsor on the ICG deal), the government determined that Stewart had not been completely truthful in his previous Grand Jury testimony and was, in fact, more criminally involved than he had admitted.  The government thus informed Attorneys Crandall and Turner that Defendant Stewart's status had changed from "witness" to "target;" and, consequently, Stewart could not testify before the Grand Jury that day.  The government states that it is the general practice of the Department of Justice not to bring "targets" of an investigation in to testify before the Grand Jury.  (Gov't Stewart Resp. at 6.)

Turner testified at the evidentiary hearing that when he and Crandall arrived with Stewart on January 5, 2011, Assistant U.S. Attorney Cares told them that, based on testimony from an earlier witness that day, their continued representation of Stewart, Zajac, and Bandemer would present a conflict of interest because these three were now "targets" of the government's investigation.  AUSA Cares told Crandall and Turner that Stewart, Zajac, and Bandemer would need to obtain separate, independent counsel.  Crandall testified at the evidentiary hearing that he was surprised when the government told him that Stewart, Zajac, and Bandemer were now targets of their investigation.

13

Crandall and Turner testified that, once informed that Stewart, Zajac, and Bandemer were "targets," they immediately ceased all representation of those individuals. Each retained new, separate counsel. Stewart was represented first by Jeffrey Collins and then by his current counsel, Elliott Hall. This change in pre-indictment counsel occurred in January 2011, more than two years before Stewart was indicted. Zajac retained Christopher Andreoff, who was subsequently replaced by Zajac's current counsel in May 2014. Again, this change in pre-indictment counsel occurred more than two years before Zajac was indicted.

### C. Attorney Turner

At the June 3, 2014 evidentiary hearing, Turner testified about the following. In 1994, he began working as a "Special Counsel" for the PFRS, and continues to work for the PFRS to this day. In 2006, his responsibilities with the PFRS were enhanced – he was asked to assist Zajac, then-General Counsel, at Board meetings. He was paid $225 an hour for his services.

In January 2007, Turner attended a birthday party for Defendant Beasley and gave Zajac $500 intended for Beasley. In August 2007, Turner attended a joint birthday party for Stewart and Bandemer and gave Zajac $1,000 intended for distribution of $500 to Stewart and $500 to Bandemer. Turner testified that Zajac asked for the contribution, and he gave it. He also testified that Zajac invited him to the birthday parties, Turner did not host them. Turner considered the birthday parties to be like any other fundraiser. He did not view his attendance at the birthday parties as any type of attempt to obtain a favor and was not promised a favor if he attended. He testified that he had attended lots of fundraisers and parties and did not view his attendance as criminal activity.

14

In October 2007, Turner got a raise from $225 an hour to $300 an hour.  He testified that he thought Beasley either made or seconded the motion, but was not sure.  Later, on the same day that Turner got his raise, a motion was made to increase Zajac's salary.  Turner testified at the evidentiary hearing that he did not believe there was any correlation between his cash contributions at the birthday parties and his salary increase because the cash given at the birthday parties was solicited by and given to Zajac.  He perceived the birthday party to be just like another fundraiser, and he was not asking for a raise and was not promised a raise.

In 2009, the PFRS Board, based on Zajac's recommendation, passed a resolution appointing the Clark Hill law firm to represent Board members and staff as fact witnesses before the Grand Jury in the government's ongoing investigation.  Crandall was designated lead counsel because he had criminal experience, and Turner was to assist Crandall because he was able to provide background on Pension Board and investment issues.

In January 2011, after Zajac was identified as a target in the government's investigation, Turner continued to work for the PFRS as Special Counsel while Zajac continued to work for the PFRS as General Counsel.  This continued until Zajac was indicted in March 2013.  In June 2013, Turner became General Counsel for the PFRS and currently serves as General Counsel.  His current hourly rate is $300 an hour before a 15% discount.

Clark Hill's representation of the PFRS includes a wide range of services, including filing civil litigation in state and federal court on the Board's behalf, providing investment advice, and other services that involve other Clark Hill attorneys.  In 2012, Clark Hill billed around $3 million for its various services to the PFRS, and billed millions of dollars in fees

15

in the years between 2006 and 2011.

### D.  Turner's Testimony Before Grand Jury

At the June 3, 2014 evidentiary hearing, Turner and Crandall testified that in early 2011, probably February, Turner was subpoenaed to testify before the Grand Jury.  At that time neither Turner nor Crandall was representing Stewart, Zajac, or Bandemer.  Turner was represented by Crandall.  Turner testified that he was never advised that he was under criminal investigation.  Rather, he was first approached to be a fact witness after Crandall and Turner had terminated their representation of Stewart, Zajac, and Bandemer.

Crandall testified that he did not know how it came about that the government wanted Turner to testify before the Grand Jury.  Crandall explained that he had an on-going dialogue with the government prosecutors and this probably included Turner's testimony. Crandall said this sort of conversation was very common, and thus he could not speak to the importance of that discussion. Crandall further testified that, during the entire time he and Turner were representing Zajac and Stewart, neither one said that Turner could not be involved because he might be a witness.

On March 16, 2011, Attorney Turner testified before the Grand Jury.  He was not asked about the Stewart and Bandemer or Beasley birthday parties at that time.  He was told that he was going to be "asked some questions about the two Detroit pension boards," and he was.  (3/16/2011 Grand Jury Tr. at 3.)  Generally, Turner was asked if Board Meetings were recorded and if the matter of recording those meetings had been addressed.  (*Id.* at 4-10.)  He was also asked about the Board's consideration of the ICG Leaseback deal and Robert Shumake (*id.* at 11-16, 22-26), and the motions to increase his hourly rate (an event that he said came as a surprise to him) and to increase Zajac's salary

16

(*id.* at 17-21).

On March 23, 2011, Attorney Turner returned to the Grand Jury and testified. This time, he was asked what he knew about birthday parties for Stewart and other Pension Board Trustees along with many other topics. (3/23/2011 Grand Jury Tr.)

On April 6, 2011, Attorney Turner once again returned to the Grand Jury and testified about the birthday parties for Stewart and other Pension Board Trustees along with many other topics. (4/6/2011 Grand Jury Tr.)

### C. Fifth Superseding Indictment

On March 20, 2013, the Grand Jury returned a Fifth Superseding Indictment charging Defendants Zajac and Stewart and others in Count 1 with conspiracy to commit honest services mail and wire fraud in violation of 18 U.S.C. § 1349.

### D. Seventh Superseding Indictment

On April 16, 2014, a new Special Grand Jury returned a Seventh Superseding Indictment in this criminal matter. The only changes in the new Indictment are the correction of one typographical error, a change in the font size to conform to a new local rule of this Court, the correction of the bank accounts identified on the chart in Count 13 against Defendant Dixon, and the removal of the phrase "illegal gratuities" from the caption of Counts 7 through 9, as the government indicated that it would do in response to Defendant Beasley's motion to strike [111].

## II.   Analysis

### A. Defendants' Motions to Dismiss Are Denied

In their motions, Defendants Zajac and Stewart argue that, at the time of their

17

September 2010 Grand Jury appearances, their attorneys, Crandall and Turner, suffered from debilitating "conflicts of interest" in violation of their constitutional rights. In their motions and at the June 3, 2014 evidentiary hearing, Defendants sought to establish that: (1) an actual conflict of interest existed because (a) at the time of Attorneys Crandall's and/or Turner's pre-indictment representation of Stewart and Zajac in the government's criminal investigation, Turner (and maybe Crandall) and the government's attorneys knew that Turner was the subject or target of that same criminal investigation, and (b) that Crandall and Turner were representing Stewart and Zajac and other Pension Board witnesses during the same pre-indictment period; and (2) Crandall's and/or Turner's conflicts-of-interest adversely affected their pre-indictment representation of Stewart and Zajac.

Specifically, Defendants sought to establish that the above conflicts of interest caused Crandall and/or Turner to refrain from:

(a) obtaining the same deal for Stewart or Zajac that they got for Bandemer,

(b) informing Stewart and Zajac that they had the right to exercise their Fifth Amendment right not to incriminate themselves in testimony before the Grand Jury and that they should invoke that privilege until offered full *Kastigar* use and derivative use immunity protections rather than sign the less-protective proffer letter agreements that they did sign,

(c) pursuing negotiations with the government that could have resulted in Stewart and Zajac preserving their right to full *Kastigar* use and derivative use immunity protections before testifying before the Grand Jury and instead counseled Stewart and Zajac to sign proffer letter agreements, and

(d) pursuing plea negotiations with the government where Stewart or Zajac would offer to cooperate and testify against other Crandall/Turner clients.

Defendants sought to establish that Attorneys Crandall and/or Turner refrained from the above conduct because of their actual conflicts of interest and concern that if Stewart got

18

a better deal with the government he would provide testimony that implicated Turner and/or other Pension Board member/clients in criminal activity.

For the reasons that follow, this Court rejects Defendants arguments that (1) there is a Fifth or Sixth Amendment, and thus constitutional as opposed to ethical, right to conflict-free counsel pre-indictment, and (2) as a result of constitutional violations caused by Crandall's and/or Turner's conflicts-of-interest, Defendants are entitled to the following remedies:

    (a) an Order from this Court declaring that their September 2010 proffer letter agreements are null and void;

    (b) a Court Order affording Stewart and Zajac full *Kastigar* use and derivative use protections and allowing a *Kastigar* hearing to confirm the government's improper derivative use of their Grand Jury testimony;[2]

    (c) an Order suppressing Stewart's and Zajac's Grand Jury testimony; and

    (d) dismissal of the charges against Stewart and Zajac in the (now) Seventh Superseding Indictment because it is tainted by the alleged unconstitutional conflicts of interest.

The Court begins its analysis with Defendants' arguments that the government had and

---

[2]To the extent Defendants argue that, based on their September 2010 proffer letter agreements, they are entitled to an evidentiary hearing under *Kastigar v. United States*, 406 U.S. 441 (1972), to determine if the government made impermissible use of "immunized" testimony against them, these arguments are rejected. Before their Grand Jury appearances in September 2010, Defendants signed proffer letters. As discussed above, these proffer letters explained the terms that governed Defendants' testimony before the Grand Jury. These proffer letters were the only agreements that applied to Defendants' testimony. Neither Defendant testified pursuant to a grant of statutory immunity. *See United States v. Mendizabal*, 214 F. App'x 496, 501-02 (6th Cir. 2006) (affirming the district court's denial of the defendant's request for a *Kastigar* hearing because the defendant had provided testimony under a proffer letter agreement which, unlike statutory immunity, "hinges on the government's informal assurance of immunity). As the Sixth Circuit observed in *Mendizabal*, because Defendants signed proffer letter agreements and were not provided with a grant of statutory immunity, they are not entitled to a *Kastigar* hearing. *Id.* at 501.

breached its duty to report any actual or potential conflict of interest to the Court at the pre-indictment stage.

### A.  Government's and Court's Duty At Pre-Indictment Grand Jury Stage

Defendants Stewart and Zajac first argue that they are entitled to the broad relief that they request because the government had and breached its duty to report any actual or potential conflict of interest to the Court at the pre-indictment stage.  Defendants further argue that, even if no constitutional violation is found, the Court should exercise its discretion under the facts presented here and grant Defendants the remedies they seek. The Court rejects these arguments.

### 1.  Relevant Case Law

As support for their arguments, Defendants rely upon decisions where the government had filed a motion to disqualify a grand jury witness's retained counsel of choice and where that witness raised constitutional arguments opposing disqualification of his retained counsel of choice.  For example, the decision cited in the government's January 2011 memorandum of law and relied upon by Defendant Zajac comes from the Fifth Circuit Court of Appeals.  *See, e.g., In re Gopman*, 531 F.2d 262 (5th Cir. 1976).  There, the Fifth Circuit granted the government's motion to have a criminal defendant's retained counsel of choice disqualified as trial counsel because of a potential conflict of interest arising from multiple representation of witnesses before the grand jury.   In *In re Gopman*, the court held that the disqualification did not affect and thus did not violate the defendant's Fifth Amendment rights.   The Court also rejected the defendant's arguments that disqualification of his counsel of choice violated his First Amendment right to freedom of association and Sixth Amendment right to counsel of his choice, holding that "the public interest in a properly

20

functioning judicial system" allowed the court to disqualify counsel. *Id.* at 267-268.

See also *In re Investigation Before February, 1977, Lynchburg Grand Jury*, 563 F.2d 652 (4th Cir. 1977), another decision Defendants rely upon to support their requested relief. This too is a case arising from a district court order granting the government's motion to disqualify the counsel of choice of various grand jury witnesses. It involved an "appeal by ten witnesses from the district court's order disqualifying Sol Z. Rosen, Esquire, and Joseph M. Whitehead, Esquire, from representing them in a grand jury investigation concerning interstate prostitution, where each witness invoked the Fifth Amendment and where the government pointed to three witnesses and Mr. Whitehead as targets of the investigation." *Id.* at 654. As the Fourth Circuit explained:

> Messrs. Rosen and Whitehead represented ten of the witnesses subpoenaed to appear before the grand jury. At the opening of the proceedings, the government informed Mr. Whitehead that he was a target of the investigation and asked him to withdraw because some of his clients might be called upon to testify against him. He refused. The court noted the possible impropriety of Mr. Whitehead's continued representation but declined to take any action to disqualify him at that time. It then denied [these ten witnesses]' initial motions to quash the subpoenas and to suppress evidence.
>
> When the witnesses represented by Messrs. Rosen and Whitehead came before the grand jury to testify, the government told at least three that they were also potential targets of the investigation. Each of the ten refused to testify on Fifth Amendment grounds.

*Id.*

The government subsequently filed a motion to disqualify Messrs. Whitehead and Rosen. It sought to disqualify Mr. Whitehead because his "representation of these clients would put him in the position to suppress possible testimony against himself." *Id.* It sought to disqualify Mr. Rosen because "he represented witnesses with possible conflicts of interest, that he could not, for example, advise any one of the witnesses to seek immunity

21

in return for testifying against his other clients, that he would be in a position to use information obtained in attorney-client relationships to the detriment of his other clients, and that his clients made legally unwarranted assertions of Fifth Amendment privilege to protect other persons." *Id.*

Despite Messrs. Whitehead's and Rosen's clients' signed waivers of possible conflicts of interest, the district court granted the government's motion to disqualify their counsel of choice, concluding that "there was not only a potential but an actual conflict of interest in Mr. Whitehead and Mr. Rosen's representation of multiple witnesses before the Grand Jury further aggravated because Mr. Whitehead was himself a target of the investigation." *Id.* (internal quotes omitted).

The Fourth Circuit affirmed the district court's decision, relying on *In re Gopman*, 531 F.2d 262, 266 (5th Cir. 1976), and citing with approval *In re Grand Jury Proceedings*, 428 F. Supp. 273 (E.D. Mich. 1976) (Freeman, J.). *Id.* at 655. It first observed that cases of this type present conflicting principles: "The first one is the entitlement of the witnesses to representation by an attorney in grand jury proceedings whether as a matter of federal procedural law or constitutional right. The second is the right of the grand jury to pursue its investigative functions, which includes the right of the public to every man's testimony. And not to be forgotten is the right of the courts to control their own officers, their attorneys." It then concluded that:

> We think when a conflict of interest appears from the record, as it does here, which may affect the grand jury's investigative function and may deprive the public of the testimony of a witness, that the district court, in its discretion, may take appropriate action to remove the conflict, which is all the district judge did in this case. And we think this may be done although it may deprive a witness of a particular lawyer. It does not deprive him of his right to be represented at all, and so both principles are preserved as well as may be.

22

*Id.* (emphasis added).  The Fourth Circuit then clarified its holding:

> Our opinion should not be read to hold that a witness is not entitled to the assistance of counsel in grand jury proceedings.  Neither should it be read to hold that mere multiple representation is of itself disqualifying.  We do hold that the district court was within its discretion in disqualifying these attorneys in this case.

*Id.  See also United States v. Mays*, 69 F.3d 116, 121-122 (6th Cir. 1995) ("balancing the constitutional right of the defendant to representation by counsel of his choosing with the court's interest in the integrity of the proceedings and the public's interest in the proper administration of justice," and holding that the district court's disqualification of one defendant's attorney in response to the government's motion was not an abuse of discretion even though the defendant did not have an opportunity to waive conflict-free representation because that defense counsel had "represented seven government witnesses during the grand jury investigation and two of [that defendant]'s codefendants" and "[t]his situation posed the threat of conflicts of interest not solely to defendant Mays but to several others involved in the case.").

## 2.  Application Here

Here, there was no disqualification motion filed by the government.  This line of authority would be relevant if there was.  Defendants' arguments stand the holdings in this line of cases on their head.  They are not asserting that their constitutional rights would be violated if the government was successful in seeking to disqualify their retained counsel of choice in connection with their Grand Jury testimony.  Rather, they are arguing the opposite – that the government should have sought disqualification of their retained pre-indictment counsel of choice and its failure to do so violated their constitutional rights.  Neither Stewart nor Zajac cites any authority for their argument – that the government has a pre-indictment

duty to inform the court of a potential conflict of interest, and a breach of any such duty would warrant the broad relief that Defendants Stewart and Zajac seek, i.e., nullification of Defendants' proffer letter agreements, the suppression of their Grand Jury testimony, and dismissal of the Indictment bringing charges against them.  Finding no authority supporting Defendants' claims of a constitutional violation, the Court will not exercise its discretion on these facts to grant the broad relief that Defendants seek.

### B.  Court's Duty To Explore Possible Conflict of Interest After Initiation of Adversarial Judicial Proceedings

The Court agrees with Defendants' argument that the Court has a duty to explore possible conflicts of interest brought to its attention after adversarial judicial proceedings have begun.  This is what the Court did at the June 3, 2014 evidentiary hearing, as well as the April 29 and May 15, 2014 hearings.  Here, the Court first discusses the relevant case law describing the Court's task.  Next, it applies that controlling precedent to the facts presented here.

#### 1.  Relevant Case Law

In *Moss v. United States*, 323 F.3d 445 (6th Cir. 2003), the Sixth Circuit addressed the Court's duty to explore possible conflicts of interest that were brought to its attention after adversarial proceedings were initiated.  The Sixth Circuit's decision in *Moss* arose from an appeal of the district court's denial of petitioners Moss's and Kohn's motions to vacate their convictions and sentences, pursuant to 28 U.S.C. § 2255, arising out of their trial counsels' alleged conflicts of interest.  *Id.* at 449.  At petitioners Moss's and Kohn's arraignment on a federal indictment, Attorney Murphy entered an appearance on behalf of both Moss and Kohn.  Six days later, Attorney Morreale entered an appearance on behalf of Moss.  *Id.* at

450.  In connection with the petitioners' § 2255 motions, the district court concluded that there was no joint representation because, post-arraignment, Attorney Murphy represented petitioner Kohn, Attorney Morreale represented petitioner Moss, and petitioners failed to convince the court otherwise.  *Id.* at 453.

In their appeal, petitioners argued that "their joint representation by defense counsel created an actual conflict of interest which rendered defense counsel's assistance constitutionally ineffective" because that conflict "precluded defense counsel from obtaining separate plea agreements with the government, particularly plea agreements requiring cooperation."  *Id.*  Petitioner Kohn also argued "that defense counsel labored under a separate conflict of interest arising from an investigation into defense counsel's alleged interference with a government witness."  *Id.*

The Sixth Circuit affirmed the district court's decision despite the fact that it found defense counsel's performance "fell below the boundary of professional competence," because "the petitioners failed to demonstrate that the alleged conflicts of interest adversely affected counsel's performance."  *Id.*  After a thorough analysis of the facts and law, the *Moss* court held that:

> the petitioners have failed to demonstrate that a conflict of interest rendered defense counsel's performance unconstitutionally inadequate.  Our decision should not be construed, however, as an approval of [defense counsel]'s conduct.  His successive representation of the petitioners, as well as his involvement in a suspect fee arrangement with a co-conspirator, strain to their very limits the boundaries of professional conduct.  Nevertheless, for the reasons stated in the foregoing opinion, we are unable to conclude that [defense counsel]'s lack of professional conduct rendered the result of these proceedings fundamentally unfair.

*Id.* at 476.

Relevant here is the *Moss* court's discussion of the court's duty when confronted with

25

a potential conflict of interest.  First, however, the Court notes that the facts giving rise to the claims in *Moss* are vastly different than those at issue in this criminal matter.  Here, Defendants allege that a conflict of interest arose from their counsels' joint representation of them (as well as other Pension Board witnesses before the Grand Jury) solely at the <u>pre-indictment</u> grand jury stage of proceedings.  Unlike *Moss*, there is no claim  that counsel at the <u>pre</u>-indictment stage (Attorneys Crandall or Turner) also represented Defendant <u>post</u>-indictment.

In *Moss,* the Sixth Circuit addressed (1) whether defense counsel <u>jointly represented</u> petitioners <u>post</u>-indictment and thus created a conflict that rendered their counsel's performance unconstitutionally inadequate (*id.* at 455-459); (2) whether defense counsel Murphy's <u>successive representation</u> of petitioner Moss during <u>pre</u>-indictment and arraignment proceedings <u>and</u> his <u>subsequent post-arraignment representation</u> of petitioner Kohn, "coupled with evidence that Moss paid at least some of Kohn's legal fees" (*id.* at 463) created a conflict of interest that adversely affected counsel's post-arraignment performance thus rendering it unconstitutionally inadequate (*id.* at 459-470); and (3) whether Kohn's <u>counsel's fear of a government investigation</u> of his <u>post</u>-indictment conduct gave rise to an actual conflict of interest that adversely affected his performance on Kohn's behalf (*id.* at 471-474).  The Sixth Circuit's analysis and conclusions are discussed in § E.2(b) below.  Relevant here, however, is the Sixth Circuit's discussion of the trial court's duty when a conflict-of-interest issue is raised.

In *Moss*, the petitioners alleged "that the district court committed reversible error by failing to inquire into Attorney Murphy's successive representations."  *Id.* at 470-71.  The Sixth Circuit observed that, under the Supreme Court's decisions in *Holloway* and *Cuyler*,

26

"a trial court has the duty to inquire adequately into a <u>trial counsel's</u> conflict of interest <u>if it knows or reasonably should know that a particular conflict exists</u>." *Id.* at 471 (citing *Holloway v. Arkansas*, 435 U.S. 475, 483-94 (1978), and *Cuyler v. Sullivan*, 446 U.S. 335, 347 (1980)) (emphasis added). The *Moss* court further observed that, despite the trial court's duty to inquire "'absent special circumstances, . . . trial courts may assume either that multiple representation entails no conflict or that the lawyer and his clients knowingly accept such risk of conflict as may exist." *Id.* (quoting *Cuyler*, 446 U.S. at 347). Finally, the *Moss* court observed that, in *Mickens v. Taylor*, 535 U.S. 162, 172-74 (2002), "the Supreme Court rejected the approach of several circuits which determined that a trial court's failure to inquire into a conflict of interest compels automatic reversal of the conviction." *Id.* at 471. Indeed, in *Mickens*, the Supreme Court observed that the "[p]etitioner's proposed rule of automatic reversal when there existed a conflict that did not affect counsel's performance, but the trial judge failed to make the [*Cuyler v.] Sullivan*-mandated inquiry, makes little sense." *Mickens*, 535 U.S. at 172. "The trial court's awareness of a potential conflict neither renders it more likely that counsel's performance was significantly affected nor in any other way renders the verdict unreliable." *Id.* at 173. As Justice Kennedy clarified in his concurring opinion, "[t]he constitutional question must turn on whether trial counsel had a conflict of interest that hampered the representation, not on whether the trial judge should have been more assiduous in taking prophylactic measures." *Id.* at 179 (Kennedy, J. concurring).

## 2. Application Here

Because the issue of a conflict was raised, the Court held an evidentiary hearing on June 3, 2014. Thus, Defendants cannot claim that, as a result of the Court's breach of its

27

duty to hold an evidentiary hearing, they are entitled to the broad relief they request.

At the June 3, 2014 evidentiary hearing, the Court evaluated Crandall's and Turner's testimony and examined whether Stewart or Zajac could establish their claims that Crandall's and/or Turner's representation of them at the pre-indictment stage of this criminal matter created a conflict of interest that adversely affected their pre-indictment representation of Defendants and thus violated their constitutional rights, warranting the broad relief they request. This proved to be an impossible task. First, as explained below, there is no Sixth or Fifth Amendment right to conflict-free counsel pre-indictment. Second, even if there were, Defendants failed to demonstrate that an actual conflict of interest[3] adversely affected Attorneys Crandall's and/or Turner's pre-indictment representation on their behalf.

### C.  No Constitutional Right to Pre-Indictment Conflict-Free Counsel

Defendants next argue that there is a pre-indictment right to counsel that gives rise

---

[3]As the *Moss* court explained, "actual conflict of interest" is "a term of art requiring a conflict of interest and adverse effect." *Moss*, 323 F.3d at 467 n.23.

> We observe that *Thomas* [*v. Foltz*, 818 F.2d 476 (6th Cir. 1987)] requires the petitioner to first demonstrate an "*actual* conflict of interest" and then demonstrate an adverse effect on the voluntary nature of the guilty plea." *Thomas*, 818 F.2d at 480.  In *Mickens*, the Supreme Court clarified its prior definition of the term "actual conflict of interest" as comprising both requirements of the *[Cuyler v.] Sullivan* test – a conflict of interest and adverse effect.  122 S. Ct. at 1245 n.5.  An "actual conflict of interest" therefore is a term of art requiring a conflict of interest and adverse effect. In examining *Thomas*, and the cases cited therein, it appears that the "actual conflict of interest" required in the first prong of the court's test requires only that the petitioner demonstrate a real or genuine, as opposed to a hypothetical conflict of interest.

*Id.* (underscored emphasis added).

28

to claims of Fifth and Sixth Amendment violations based on an actual conflict of interest that adversely affected Attorneys Crandall's and/or Turner's pre-indictment representation. Defendants are mistaken.  As discussed below, the Sixth Amendment right to counsel does not attach at the pre-indictment stage, and the Fifth Amendment due process right discussed in *Wood* does not address pre-indictment representation and is also easily distinguishable on the facts, i.e., conflict arising from fact that defendant's non-party employer hired and paid for defendants' legal representation thus giving rise to divided loyalties.

### 1.   Sixth Amendment Rights Not Yet Attached Pre-Indictment

In *Wood v. Georgia*, 450 U.S. 261, 271 (1981), the Supreme Court held that "[w]here a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest."  (citing *Cuyler v. Sullivan*, 466 U.S. 335 (1980); *Holloway*, 435 U.S. at 481).

It is well-established in the Sixth Circuit that there is no Sixth Amendment right to counsel based on pre-indictment grand jury proceedings.  *See United States v. Myers*, 123 F.3d 350, 359 (6th Cir. 1997) (concluding that, although the defendant had been "a target when he appeared before the grand jury," he "had not been formally charged," and thus "his Sixth Amendment right to counsel had not yet attached.").  *See also United States v. Fowler*, 535 F.3d 408, 416 (6th Cir. 2008) (similarly concluding that there could be no Sixth Amendment violation "because the Sixth Amendment right to counsel attaches only at or after the initiation of adversary judicial proceedings – whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.") (internal quotation marks and citations omitted).

29

The right to effective assistance of counsel is "derivative" of the Sixth Amendment right to counsel. *Moss*, 323 F.3d at 454. If there is no adversarial judicial proceeding, there is no Sixth Amendment right to counsel and thus no derivative right to effective assistance of counsel. Applying *Smith*, *Fowler*, and *Moss* here, Defendants' counsel's actions at the grand jury stage, before the right to counsel attaches, cannot form the basis for a claim of ineffective assistance of counsel. Defendants' claims to the contrary are thus rejected. *See also United States v. Latouf*, 132 F.3d 320, 330 (6th Cir. 1997) (affirming the district court's denial of the defendant's motion to suppress her statement to the grand jury based on alleged bad advice from her then-counsel because "she was not yet indicted and, as an uncharged person, did not have a right to effective assistance of counsel"); *United States v. Radford*, Civil No. 00-70255, Crim. No. 97-81134, 2000 WL 1137712, **2-3 (E.D. Mich. July 7, 2000) (Edmunds, J.).

In *Radford*, this Court rejected the defendant's ineffective assistance claim in his § 2255 motion that was based on arguments that are substantially similar to those raised here, i.e., the defendant argued that his pre-indictment counsel "failed (1) to obtain an immunity agreement with the Government prior to his testimony before the grand jury and prior to his debriefings with the Government, and (2) to advise [him] to invoke his Fifth Amendment privilege against self-incrimination when testifying before the Grand Jury and when making statements during debriefings with the Government." *Id.* at *2. Applying prevailing Supreme Court and Sixth Circuit precedent, this Court concluded that "there is no Sixth Amendment right to counsel pre-indictment and therefore there can be no Sixth Amendment claim of ineffective assistance of counsel for pre-indictment representation." *Id.* at *3. The same analysis and result apply here.

30

Similarly, Defendants cannot rely on their Fifth Amendment privilege against self-incrimination to support their claims of ineffective assistance of counsel based on an alleged conflict of interest.  This Court's decision in *Radford* and the Sixth Circuit's decision in *Myers* foreclose Defendants' argument.  As this Court explained in *Radford*, the Sixth Circuit addressed and rejected the defendant's argument in *Myers* that his "'time before the grand jury constituted, or was the equivalent to, custodial interrogation so as to entitle him to a complete rights warning, including a warning advising him of his right to appointed counsel.'"  *Radford*, 2000 WL 1137712 at *4 (quoting *Myers*, 123 F.3d at 360).  In *Myers*, the Sixth Circuit rejected the defendant's argument that he had a right to appointed counsel that is derived from his Fifth Amendment privilege against self incrimination.  Rather, it held that "[i]n light of the Supreme Court's opinions . . . and the opinions rendered by our sister circuits, we are satisfied that the warnings given to [the defendant] adequately inform him of his Fifth Amendment privilege against self-incrimination."   *Myers*, 123 F.3d at 360 (citations omitted).

### 2.  Fifth Amendment Due Process Rights to Conflict-Free Representation

Defendants also argue that, even if there is no Sixth Amendment right to conflict-free counsel pre-indictment, there is a Fifth Amendment due process right.  In support, Defendants rely on the Supreme Court's decision in *Wood v. Georgia*, 450 U.S. 261 (1981). The most obvious problems with Defendants' arguments are that:  (1)  *Wood* does not address a pre-indictment constitutional right to conflict-free counsel; and (2) the facts and conflict at issue in *Wood* are readily distinguishable from those presented here.

### (a)  *Wood v. Georgia* Does Not Support Defendants' Argument

In *Wood*, the Supreme Court observed that "[t]he potential for injustice in this situation

31

is sufficiently serious to require us to consider whether petitioners have been deprived of federal rights under the Due Process Clause of the Fourteenth Amendment." *Wood v. Georgia*, 450 U.S. at 271. There, Petitioners were employees of an adult movie theater and bookstore. *Id.* at 263. All three were convicted in state court "of distributing obscene materials and sentenced to periods of probation on the condition that they make regular installments toward the satisfaction of substantial fines." *Id.* at 262. They failed to do so, had their probation revoked, and were "now claiming that these revocations discriminated against them on the basis of wealth in violation of the Equal Protection Clause of the Fourteenth Amendment." *Id.* The Supreme Court did not address the petitioners' argument raising that difficult equal protection issue. Rather, it remanded the case "for further finding concerning a possible due process violation" caused by an apparent risk of conflict that arose from the fact that their employer paid for their legal representation.

It is from this decision that Defendants argue that they have a Fifth Amendment due process right to conflict-free counsel that attached before and during their grand jury testimony. The Court rejects Defendants' argument. It requires an impermissible leap from the facts, analysis, and holding in *Wood*.

In *Wood*, the Court observed that each petitioner was represented by the same counsel "since the time of their arrests," and their testimony "at the probation revocation hearing makes it clear that none of them ever paid – or was expected to pay – the lawyer for his services." *Id.* at 266. "They understood that this legal assistance was provided to them by their employer. . . . They were told that their employer also would pay any fines and post any necessary bonds, and these promises were kept for the most part." *Id.* But, "[f]or some reason," the Court observed, "the employer declined to provide money to pay

the fines" now at issue. *Id.* at 267.

The Court then observed that this situation created the risk of a conflict of interest. "Since it was this decision by the employer that placed petitioners in their present predicament, and since their counsel has acted as the agent of the employer and has been paid by the employer, the risk of conflict of interest in this situation is evident." *Id.* It reasoned that the employer's decision not to pay the fines as promised "suggests the possibility that it was seeking – in its own interest – a resolution of the equal protection claim" that the petitioners had raised. *Id.* Although the Court could not be sure "that the employer and petitioners' attorney were seeking to create a test case, it observed that "there is a clear possibility of conflicts of interest on these facts." *Id.* The Court further observed that "Courts and commentators have recognized the inherent dangers that arise when a criminal defendant is represented by a lawyer hired by a third party, particularly when the third party is the operator of the alleged criminal enterprise." *Id.* at 268-69.

> As suggested above, the factual setting of this case requires the Court to take note of the potential unfairness resulting from this particular third-party fee arrangement. Petitioners were mere employees, performing the most routine duties, yet they received heavy fines on the apparent assumption that their employer would pay them. They now face prison terms solely because of the employer's failure to pay the fines, having been represented throughout by a lawyer hired by that employer. <u>The potential for injustice in this situation is sufficiently serious to require us to consider whether petitioners have been deprived of federal rights under the Due Process Clause of the Fourteenth Amendment</u>.

*Id.* at 270-71 (emphasis added).

The *Wood* Court acknowledged that, although it was "difficult" for it "to determine whether an actual conflict of interest was present, especially without the benefit of briefing and argument," nonetheless "the record does demonstrate the *possibility* of a conflict of

33

interest was sufficiently apparent at the time of the revocation hearing to impose upon the court a duty to inquire further." *Id.* at 272. Moreover, "[a]ny doubt as to whether the court should have been aware of the problem is dispelled by the fact that the State raised the conflict problem explicitly and requested that the court look into it." *Id.* at 272-73. For these reasons, the Court vacated the judgment below and remanded the case back to state court on due process grounds. *Id.* at 273. It instructed the state court to "hold a hearing to determine whether the conflict of interest that this record strongly suggests actually existed at the time of the probation revocation or earlier. If the court finds that an actual conflict of interest existed at that time, and that there was no valid waiver of the right to independent counsel, it must hold a new revocation hearing that is untainted by a legal representative serving conflicting interests." *Id.* at 273-74 (emphasis added).

### (b) The Sixth Circuit's Decision in *Gordon v. Norman* does not support Stewart's argument

Defendants make much of the Sixth Circuit's observation in *Gordon v. Norman*, 788 F.2d 1194, 1198 (6th Cir. 1986), that the defendant police officers in a § 1983 excessive force case relied on *Wood* to support their argument that the City attorney representing them had an actual conflict of interest with their interests and thus his conflicted representation violated their Fifth Amendment due process rights to a fair trial. That case, however, does not support an argument that the Sixth Circuit would recognize a Fifth Amendment due process violation under the facts presented here, i.e., pre-indictment representation. Rather, it impliedly rejects a universal *per se* conflict rule and instead relies on the Supreme Court's decision in *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1979). *Id.* "[T]he Supreme Court made it clear that prejudice would be presumed only if the defendant

34

demonstrated that counsel actively represented conflicting interests and that an actual conflict of interest adversely affected his lawyers performance." *Id.* (quoting *Cuyler*, 446 U.S. at 350). The Sixth Circuit in *Gordon* next applied the *Cuyler* analysis, rejected the defendants' Fifth Amendment due process arguments, and concluded that the "defendants have failed to show that they were adversely affected by this purported conflict or that their trial counsel failed to exercise independent judgment depriving these defendants of a fair trial." *Id.* The *Gordon* court observed in a footnote that it was making no comment "as to the possible ethical violations by the Law Director or as to potential malpractice liability." *Id.* at 1199 n.4.

### (c) Defendants' Reliance on *In Re Taylor* Is Misplaced

Defendants also rely on a footnote in *In re Taylor*, 567 F.2d 1183, 1186 n.1 (2d Cir. 1977), to argue that they had a Fifth Amendment constitutional due process right to counsel with regard to their grand jury appearance (as well as a First and Sixth Amendment rights to counsel of their choice). Defendants' reliance on this decision is misplaced. *In re Taylor* brings the Court once again to the scenario where a grand jury witness was opposing the government's motion to disqualify the witness's retained counsel of choice.

In the footnote relied upon by Defendants, the Second Circuit observed that:

The Supreme Court has held that a witness before a grand jury cannot insist, as a matter of constitutional right, on being represented by counsel. *In re Groban*, 352 U.S. 330 (1952). Counsel may, however, wait outside of the grand jury room; and, at any and all times during questioning, a witness may leave the room to consult with his attorney. [citations omitted]. This accommodation between the investigatory role of the grand jury and the right of a witness to enjoy the advice of legal counsel necessarily implies that counsel assisting the witness be the counsel of his choice. To impose counsel upon a witness against his will or arbitrarily to forbid him from retaining a particular attorney unnecessarily obstructs his ability to enter private contractual arrangements for representation and would deprive him of his constitutional right to due process

35

of law.  [citations omitted].

*Id*. at n.1 (emphasis added).

*In re Taylor* arose from Mr. Taylor's appeal of the district court's order granting the government's motion seeking to prohibit him from retaining "William Erlbaum, Esq., as his attorney in connection with a grand jury subpoena."  *Id*. at 1185.  As the Second Circuit explained:

> The order was issued after the court's in camera examination of an affidavit and exhibits submitted by the Government attorney, who is directing the grand jury investigation.  The affidavit and exhibits, sealed by the court's order, allegedly establish that a conflict exists between Mr. Erlbaum's representation of [Mr. Taylor] and of other targets of the investigation.

*Id*.  Mr. Taylor had been served with a subpoena "to appear and testify before a grand jury investigating possible federal offenses related to the organization, construction, and operation of direct-lease day care centers in New York City," and he had "retained Mr. Erlbaum to advise him in connection with his grand jury appearance."  *Id*.  The government, in support of its motion to disqualify, "stated that, based on other evidence already presented to the grand jury, it was aware that appellant possessed knowledge that would incriminate [other clients of attorney Erlbaum] and that it was prepared to seek use-immunity for Taylor and compel him to testify before the grand jury."  *Id*.  "The Government refused to disclose to Mr. Erlbaum and to appellant, Taylor, the underlying basis of the alleged conflict of interest on the ground that to do so would violate the secrecy of the grand jury proceedings."  Rather, so as not to violate that secrecy, the "Government asked the court to review in camera certain materials already before the grand jury which would demonstrate the conflict and the need for independent counsel."  *Id*.

The issue on appeal was "whether or not the district court's in camera inspection of

36

Government documents and subsequent order violated Taylor's constitutional right to counsel of his choice." *Id.* at 1186. The Second Circuit reversed the district court's decision as premature.

> Appellant has not yet appeared before and been questioned by the grand jury; nor has he indicated that he intends to invoke his privilege not to testify on the ground of self-incrimination. . . . Most importantly, he has not formally been offered immunity, pursuant to 18 U.S.C. § 6002, in exchange for his testimony. It is only when this stage in the grand jury proceedings has been reached, the Executive officer has approved the offer of immunity, and the appellant refuses on advice of counsel to answer a proper question, that the issue of Mr. Erlbaum's conflict of interest in continuing to represent appellant will the issue be ripe for a hearing.

*Id.* at 1187.

The Second Circuit further observed that "[t]he in camera proceeding" deprived both the appellant and his attorney of choice, Mr. Erlbaum, "of an opportunity to refute the claims made by the Government with respect to Taylor's right to counsel of his choice;" "his right to associate for the purpose of retaining legal representation;" and "the right of Mr. Erlbaum to practice one's chosen profession." *Id.* at 1189. It concluded that it was improper for the district court, "on the basis of an in camera examination of the Government documents, to impose its view of an attorney's <u>ethical responsibility</u> in <u>a private attorney/client arrangement</u> where no compelling public interest has yet been shown. *Id.* at 1191 (emphasis added).

In a 2012 decision, the Second Circuit observed that the holding in *In re Taylor* "is questionable in light of the intervening Supreme Court decision" in *Wheat v. United States*, 486 U.S. 153 (1988). *See United States v. Cain*, 671 F.3d 271, 295 n.10 (2d Cir. 2012). In *Cain*, the district court, over the defendant's objection, disqualified his retained counsel of choice. On appeal, the Second Circuit held that the district court did not abuse its

37

discretion in granting the government's motion to disqualify his counsel of choice.  *Id.* at 295.

The *Cain* court first observed that:

> The Sixth Amendment provides that in all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for defense.  Implicit in this guarantee is the principle that, in most cases, a criminal defendant may be represented by any counsel who will agree to take his case.  The right to counsel of one's choice is not an absolute one, however.  The Sixth Amendment also embraces a right to effective assistance of counsel, which includes the right to be represented by an attorney who is free from conflicts of interest.  Where the right to counsel of one's choice conflicts with the right to an attorney of undivided loyalty, the determination of which right is to take precedence must generally be left to the defendant, who may make a knowing and intelligent waiver of his right to a conflict-free lawyer if he desires to continue the representation.

*Id.* at 293 (internal quotation marks and citations omitted).  The *Cain* court then cautioned that:

> Nonetheless, <u>there exists a narrow class of so-called per se conflicts that are not susceptible to waiver</u>.  Such conflicts may not be waived because, "while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers."

*Id.* (quoting *Wheat v. United States*, 486 U.S. 153, 159 (1988) (emphasis added)).

The *Cain* court went on to examine the Supreme Court's decision in *Wheat*.

In that case, the Court considered whether the district court had properly rejected a substitution of defense counsel on the ground that the substitute attorney had an <u>unwaivable conflict</u> owing to his representation of two codefendants and potential witnesses in the case.  <u>Although</u> all three defendants had <u>agreed to waive their rights to conflict-free counsel</u>, the district court concluded that the conflict was unwaivable and denied the request for substitution.  The Supreme Court ultimately approved that decision, <u>rejecting the defendant's argument that the district court's refusal to allow the substitution violated the Sixth Amendment</u>.

The Court observed that two important interests may impose limits on a

38

defendant's right to waive attorney conflicts: (1) "the essential aim of the [Sixth] Amendment," which is "to guarantee an effective advocate for each criminal defendant," and (2) the "independent interest" of federal courts "in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." [*Wheat*], 486 U.S. at 159-60. These interests, as well as <u>the potential for gamesmanship on the part of the defendant who waives a conflict only to later claim ineffective assistance</u>, weigh heavily in favor of affording the district court "substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses." *Id.* at 163. Given the difficulties of the decision, the uncertainties involved where the conflict has yet to fully materialize, and the need for the district court to rely on its "instinct and judgment based on experience in making the [disqualification] decision," the Court concluded that although judges "must recognize a presumption in favor of petitioner's counsel of choice," the evaluation of whether "the facts and circumstances" of a particular case evince a conflict so serious as to be unwaivable is a discretionary one that is best left "primarily to the informed judgment of the trial court." *Id.* at 163-64. Accordingly, on the facts before it, the Court held that, "[v]iewing the situation as it did before trial. . . the District Court's refusal to permit the substitution of counsel in this case was within its discretion and did not violate petitioner's Sixth Amendment rights." *Id.* at 164.

*Cain*, 671 F.3d at 294 (quoting *Wheat*) (emphasis added).

Turning its attention to the facts before it, the *Cain* court concluded that the district court did not abuse its discretion in granting the government's motion to disqualify the defendant's counsel of choice.

Although [defendant's counsel] was not a potential target of the grand jury investigation . . . we cannot say that the district court abused its discretion in concluding that the risk that [defendant's counsel] would become a witness against his client was sufficient to justify his disqualification.

*Id.* at 295.

Defendants pull legal principles from this and the other decisions discussed above to string together an argument that their constitutional rights were violated because (1) the government breached its duty to make sure they had conflict-free counsel at the pre-

indictment stage; and (2) Attorneys Crandall and/or Turner had nonwaivable, actual conflicts of interest that negatively impacted their representation of Defendants Stewart and Zajac prior to and during their testimony before the Grand Jury in September 2010.  None of these decisions, however, reach as far as Defendants stretch them.

### D. Defendants' Claims of Ethical Violations Are Insufficient To Establish Constitutional Violation

Defendants next argue that Attorneys Crandall and Turner violated various ethics rules as a result of their divided loyalties and conflicts of interest and those ethics violations are sufficient for the Court to find that Attorneys Crandall and/or Turner violated Defendants' constitutional rights, thus warranting the broad relief they now request.  These arguments are rejected.  Before it begins its analysis, however, the Court first observes that, despite their claims of ethical breach here, Defendants never sought to bring these matters to the attention of the Attorney Grievance Board or the Attorney Discipline Board.

As this Court recognized in *United States v. Kilpatrick*, No. 10-20403, 2013 WL 4029084 (E.D. Mich. Aug. 8, 2013), "[t]he Sixth Amendment right to have a conflict-free counsel requires a different analysis than an inquiry whether counsel has violated a rule of professional responsibility."  *Id.* at 17 (citing *Nix v. Whiteside*, 475 U.S. 157, 165 (1986)). This Court further observed that, "[a] criminal defendant can only demonstrate a Sixth Amendment violation resulting from a conflict of interest if he establishes both that his counsel 'actively represented conflicting interests,' and 'an actual conflict adversely affected his lawyer's performance.'"  *Id.* (quoting *Burger v. Kemp*, 483 U.S. 776, 783 (1987) (internal quotation marks and citations omitted)).  *Accord*, *United States v. Hoffman*, 926 F. Supp. 659, 677 (W.D. Tenn. 1996), *aff'd*, 124 F.3d 200 (6th Cir. 1997).

40

In *Hoffman*, the court rejected breach-of-ethics arguments similar to those raised here. The *Hoffman* court rejected the defendant's arguments as "attempts to bypass the correct inquiry by contending that [his] right to conflict-free representation was violated because professional ethics dictated that [his attorney] should have withdrawn as counsel for defendant." *Id.* at 677 n. 36. It observed that "reference to professional ethics is not definitive" in the context of a claim of ineffective assistance of counsel. *Id.* (citing and quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984) ("prevailing norms of practice . . . are only guides.").

### E. Defendants Have Not Shown That An Actual Conflict of Interest Adversely Affected Crandall's and/or Turner's Pre-Indictment Representation

For the reasons stated below, even if Defendants could establish that they had a pre-indictment constitutional right to conflict-free counsel, they have not established that an actual conflict of interest adversely impacted Crandall's and/or Turner's pre-indictment representation of them. The Court begins its analysis here a discussion of the relevant case law, then a recap of Defendants' arguments and testimony from the June 3, 2014 evidentiary hearing, and then proceeds with a discussion and application of the relevant case law to the facts presented here.

### 1. Per Se Approach - Rejected By The Sixth Circuit

Defendants Stewart and Zajac first argue that the Court should adopt a *per se* approach when the defendant's counsel is being investigated for the same crime as his client and do away with the need for Defendants to show that their counsels' actual conflicts of interest adversely impacted their representation, i.e., the second prong of the *Cuyler* test.

In support, they cite decisions from other circuits.  The Sixth Circuit, however, has rejected a *"per* se rule as to conflicts of interest and requires proof of an actual conflict."  *Taylor v. United States*, 985 F.2d 844, 846 (6th Cir. 1993) (citing *Thomas v. Foltz*, 818 F.2d 476, 480-81 (6th Cir. 1987)).  Despite Defendant Zajac's attempt to distinguish *Taylor* on its facts, that decision acknowledges that the Sixth Circuit has rejected a *per se* rule as to all conflicts of interest.

### (a) Relevant Case Law

In *Thomas v. Foltz*, the same attorney was retained to represent all three defendants, and none objected to the attorney's joint representation.  818 F.2d at 477-78.  Ultimately, all three defendants agreed to plead guilty.  "According to Thomas, his decision to plead was based in part on the knowledge that pleas from all three defendants was necessary for the plea bargain.  He also believed that he was forced to enter the plea by [his attorney] and [the trial judge]."  *Id*. at 478-79.  Thomas was unsuccessful on his direct appeals, but successful on his petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, alleging that he was denied effective assistance of counsel because of his counsel's joint representation.  *Id*. at 479.  Foltz then appealed to the Sixth Circuit.  *Id.*

The issue on appeal was "whether Thomas was denied effective assistance of counsel due to a conflict of interest, where his attorney jointly represented all the defendants, the defendants were presented with an 'all or nothing' plea agreement, and Thomas was reluctant to accept the agreement but was persuaded to do so by counsel."  *Id*. at 479-480.  The Sixth Circuit affirmed, finding that Thomas' counsel's actual conflict of interest had an adverse impact on his representation and on Thomas' decision to plead guilty and that Thomas had thus been denied effective assistance of counsel due to his

counsel's conflict of interest.  *Id.* at 483.

Important here is the Sixth Circuit analysis.  It observed that ineffective assistance of counsel claims that are based on a claimed conflict of interest are analyzed under the standard announced by the Supreme Court in *Cuyler v. Sullivan*, 446 U.S. 335 (1980), and summarized by the Court in *Strickland v. Washington*, 466 U.S. 668, 692 (1984):

> In *Cuyler* . . . [we] held that prejudice is presumed when counsel is burdened by an actual conflict of interest.  In those circumstances, counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties.  Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests.  Given the obligation of counsel to avoid conflicts of interest and the ability of trial courts to make early inquiry in certain situations likely to give rise to conflicts . . . it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest.  <u>Even so, the rule is not quite the *per se* rule of prejudice that exists for the Sixth Amendment claims mentioned above [actual or constructive denial of assistance of counsel altogether].   *Prejudice is presumed only if the defendant demonstrates that counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance.*</u>"

*Thomas v. Foltz*, 818 at 480 (quoting *Strickland*, 466 U.S. at 692 quoting *Cuyler*, 466 U.S. at 345-50 (emphasis added)).[4]  *See also Moss*, 323 F.3d at 471-73.

In *Moss*, the Sixth Circuit considered and rejected an argument similar to Defendants'

---

[4]The right to conflict-free representation is principally derived from the Sixth Amendment right to counsel and thus the right to effective counsel.  Decisions addressing the right to conflict-free representation thus generally arise in the context of a habeas petition.  As the federal courts acknowledge, there are two ways to assert a claim based on a counsel's conflict of interest:  (1) under *Strickland*, where the petitioner is required to establish the existence of a potential conflict of interest that <u>prejudiced</u> his defense; or (2) under *Cuyler*, where the petitioner has a lighter burden and is required to establish a Sixth Amendment violation by showing that an <u>actual conflict of interest</u> <u>adversely affected</u> his counsel's performance.  If the petitioner satisfies that burden, prejudice is presumed.  *See Hall v. United States*, 371 F.3d 969, 973 (7th Cir. 2004).  Moreover, under *Cuyler*, "an actual conflict exists if the defense counsel was faced with a choice between advancing his own interests above those of his client," i.e., "when the attorney faces the possibility of having to cross-examine his former client" and face the danger of "fail[ing] to cross-examine the former client rigorously for fear of revealing or misusing privileged information."  *Id.*

here – that when counsel is being investigated by the government in connection with the same investigation as his client, the Sixth Circuit applies a *per se* approach that does not require Defendants to establish that an actual conflict of interest adversely affected pre-indictment counsel's representation.  Specifically, the *Moss* court considered petitioner Kohn's "separate conflict of interest claim arising from" the government's alleged "investigation into Attorney Murphy's role in soliciting [indicted co-conspirator Jaeger] to bribe a potential witness."  *Id.* at 471.  It first observed that "[i]t is well-established that a conflict of interest may arise where defense counsel is subject to a criminal investigation." *Id.* at 472 (citing *Taylor v. United States*, 985 F.2d 844, 846 (6th Cir. 1993)).[5]  To establish a conflict of interest, "the alleging party must demonstrate a nexus between the crimes of the client and the attorney."  *Id.*   The *Moss* court rejected Kohn's claim, finding that he failed to establish that there was a conflict of interest because the government clarified that it "was not accusing Attorney Murphy of any improprieties" and "did not launch an investigation into Attorney Murphy's activities."  *Id.* at 472-73.  The court also rejected Kohn's claim "that it was Attorney Murphy's <u>fear</u> of being investigated that created an actual conflict of interest."  *Id.* at 473 (emphasis added).  It observed that "[t]here lacks any controlling authority to support the proposition that an attorney's fear of investigation may give rise to a conflict of interest."  *Id.*  The *Moss* court further observed that, "[a]ssuming *arguendo*, that we would entertain an extension of our precedent into such a speculative scenario, <u>Kohn's claim nevertheless fails because he cannot demonstrate any adverse</u>

---

[5]In *Taylor*, the Sixth Circuit observed that "[t]his court specifically has rejected a *per se* rule as to conflicts of interest and requires proof of an actual conflict."  *Id.* at 846 (citing *Thomas v. Foltz*, 818 F.2d at 480-81).

44

effect or prejudice as a result of the alleged conflict." *Id.* (emphasis added).

Kohn presents no direct evidence demonstrating adverse effect or prejudice. Rather, Kohn invites us to infer that Attorney Murphy's conflict of interest resulted in his attempts to facilitate the government's prosecution of Kohn. While we decline to make this inference, we note that such an inference is unwarranted in light of the entirety of the record. It is reasonable to conclude that Attorney Murphy would have urged Kohn to enter into plea negotiations with the government had he wanted to improve his standing with the U.S. Attorney's Office. To the contrary, Kohn alleges throughout this appeal that Attorney Murphy actively sought to dissuade him from exploring possible plea scenarios. Consequently, there lacks any indication that Attorney Murphy's fear of a pending investigation detrimentally impacted his representation of Kohn.

*Id.*

### (b) Application Here

Similar to the petitioners in *Moss*, Defendants here cite no authority for the argument that counsel's <u>fear of a government investigation</u> creates a conflict of interest, i.e., that Attorney Turner's fear of being investigated for the same offense as Defendants created an actual conflict of interest. Moreover, as discussed in *Moss*, assuming *arguendo* that the court did find an actual conflict of interest, Defendants failed to demonstrate that Attorney Turner's "fear of a pending investigation" detrimentally impacted his pre-indictment representation of them. *See* § E.3 below.

### 2. Sixth Circuit Requires Defendants to Establish That An Actual Conflict of Interest Adversely Affected Their Counsel's Performance

#### (a) *Thomas* Decision

##### (1) Actual Conflict of Interest

In *Thomas*, the Sixth Circuit observed that it "has interpreted the *Cuyler* test as directing courts to determine, on the facts of each case, whether there is an actual conflict of interest and whether that conflict has caused ineffective performance in violation of the

provisions of the Sixth Amendment." *Thomas*, 818 at 480 (internal quotation marks and citation omitted).

The *Thomas* court next acknowledged that "[t]he standard for determining whether an actual conflict of interest exists" requires the defendant to "make a factual showing of inconsistent interests and <u>must demonstrate that the attorney made a choice between possible alternative courses of action</u>, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to another.  <u>If he did not make such a choice, the conflict remained hypothetical. . . . There is no violation where the conflict is irrelevant or merely hypothetical; there must be an actual significant conflict</u>."  *Id.* at 481 (internal quotation marks and citations omitted) (emphasis added).

Applying that test, the *Thomas* court first observed that "[j]oint representation of codefendants does not per se constitute ineffective assistance of counsel due to a conflict of interest."  *Id.*  However, "a conflict of interest stemming from multiple representation may prevent an attorney 'from exploring possible plea negotiations and the possibility of an agreement to testify for the prosecution.'"  *Id.* (quoting *Holloway v. Arkansas*, 435 U.S. 475, 490 (1978)).  In fact, that is precisely what Thomas' counsel acknowledged.  "He stated that he would not have considered offering one of the defendants, such as Thomas, to testify against the others in exchange for a more favorable plea agreement because that would have been 'grossly unfair' under the circumstances."  *Id.*  The *Thomas* court thus found that "foregoing such plea negotiations is proof of an actual conflict of interest."  *Id.*  "There was an actual conflict of interest in the instant case, since there were competing interests at stake which attorney Campbell could not pursue due to his joint representation <u>and</u> the 'all or nothing' nature of the plea agreement."  *Id.* at 481-82 (emphasis added).  The court

46

explained: "[w]hile we recognize that joint representation does not alone constitute ineffective assistance of counsel due to a conflict of interest, and that it is not necessarily improper for counsel to advise a defendant to plead guilty in a manner consistent with codefendants, we believe that the combination of factors in the instant case created an actual conflict of interest." *Id.* at 482 (emphasis added).

### (2)    Adverse Affect

Recognizing that "the existence of an actual conflict will not alone support a finding that Campbell was constitutionally ineffective," the *Thomas* court went on to note that "there must [also] be evidence that Campbell's conflict adversely affected the voluntary nature of Thomas' guilty plea." *Id.* What was not necessary, however, "was a showing of prejudice as normally required under *Strickland*; rather, if the defendant is able to demonstrate that a conflict of interest had an adverse impact on the voluntariness of his guilty plea, prejudice will be presumed." *Id.*

Observing that the evil in a joint-representation conflict-of-interest case lies "in what the advocate finds himself compelled to *refrain* from doing," the *Thomas* court concluded that once Thomas' codefendants decided to plead guilty, his counsel, Campbell, "was compelled to refrain from advising Thomas not to plead since doing so would have caused the collapse of the plea agreement to the detriment" of Thomas' codefendants." *Id.* (emphasis added). Moreover, "once Campbell obtained the commitments of [Thomas' codefendants], he was compelled to refrain from seeking a separate deal for Thomas by offering Thomas to testify against [his codefendants]. Since an independent counsel would not have had those concerns, we find that Campbell's conflict of interest had an adverse impact on [Thomas'] representation." *Id.*

47

#### (b) *Moss* Decision

In *Moss v. United States*, the Sixth Circuit was once again called upon to apply the analysis announced by the Supreme Court in *Cuyler*. The *Moss* Court addressed (1) whether defense counsel  jointly represented petitioners post-indictment and thus created a conflict that rendered their counsel's performance unconstitutionally inadequate (323 F.3d at 455-459); (2) whether defense counsel Murphy's successive representation of petitioner Moss during pre-indictment and arraignment proceedings and his subsequent post-arraignment representation of petitioner Kohn, "coupled with evidence that Moss paid at least some of Kohn's legal fees" (*id.* at 463) created a conflict of interest that adversely affected counsel's post-arraignment performance thus rendering it unconstitutionally inadequate (*id.* at 459-470); and (3) whether Kohn's counsel's fear of a government investigation of his post-indictment conduct gave rise to an actual conflict of interest that adversely affected his performance on Kohn's behalf (*id.* at 471-474).

#### (1) Conflict Arising From Joint Representation

The *Moss* court affirmed the district court's finding that there was no joint representation of petitioners by defense counsel. *Id.* at 456-59. "Joint, or dual, representation occurs where a single attorney represents two or more co-defendants in the same proceeding." *Id.* at 455. This is also referred to as "multiple representation." *Id.* at n.15. At petitioners Moss's and Kohn's arraignment on a federal indictment, Attorney Murphy had entered an appearance on behalf of both Moss and Kohn. Six days later, Attorney Morreale entered an appearance on behalf of Moss. *Id.* at 450. Petitioners Moss and Kohn argued on appeal that Attorney Murphy's "'joint, overlapping, and contemporaneous' attorney-client relationship" with them "rendered Attorney Murphy

48

unable to explore possible plea opportunities with AUSA Janice," the government's

counsel. *Id.* at 455. The *Moss* court first observed that "[w]hile joint representation of co-

defendants <u>does not per se constitute ineffective assistance of counsel</u>, *see Thomas v.*

*Foltz*, 818 F.2d 476, 481 (6th Cir. 1987), the Supreme Court repeatedly has cautioned

against 'the high probability of prejudice arising from multiple concurrent representation,

and the danger of proving that prejudice.'" *Id.* at 455-56 (quoting *Mickens*, 122 S. Ct. at

1245) (emphasis added). It then explained why joint or multiple representation is suspect,

quoting the Supreme Court's decision in *Holloway*:

> Joint representation of conflicting interests is suspect because of what it tends
> to prevent the attorney from doing . . . the evil – it bears repeating – is in what
> the advocate finds himself compelled to refrain from doing, not only at trial but
> also as to possible pretrial plea negotiations and in the sentencing process. . .
> . The mere physical presence of an attorney does not fulfill the Sixth
> Amendment guarantee when the advocate's conflicting obligations have
> effectively sealed his lips on crucial matters.

*Id.* at 456 (quoting *Holloway*, 435 U.S. at 490). After an evidentiary hearing on the

petitioners' post-judgment claims of ineffective assistance of counsel, including their claim

that "conflicts of interest arose from Attorney Murphy's joint representation of their

defense," the district court found that Attorney Murphy had not "engaged in joint

representation." *Id.* at 452-53, 456. It determined that:

> Attorney Murphy testified that it was never his intention to represent [Moss]
> during trial as [Moss] was Attorney Morreale's client. Attorney Morreale also
> testified that Attorney Murphy entered an appearance on behalf of [Moss] at the
> arraignment only because Attorney Morreale was unable to attend the
> arraignment. Sometime shortly thereafter, it was definitely settled that Attorney
> Murphy would represent Kohn and Attorney Morreale would represent [Moss].

*Id.* (quoting the district court). On appeal, the *Moss* court found that the record supported

"the district court's conclusion as to the absence of joint representation." *Id.* at 456. "While

the record lacks the precise moment when defense counsel agreed to provide Moss and Kohn with separate representation, the agreement was apparent to other individuals involved in the earliest stages of the proceedings." *Id.* at 457.

### (2) Conflict Arising From Successive Representations

Next, the *Moss* court examined whether a conflict of interest arose from counsel's successive representation. "Although we concur in the district court's finding that 'Attorney Murphy never intended to represent Moss *at trial*,' the record reveals that Attorney Murphy developed an attorney-client relationship with Moss during the pre-indictment proceedings. . . . While this attorney-client relationship ceased shortly after the arraignment, it is with little hesitation that we conclude that Attorney Murphy represented Moss during the pre-indictment period." *Id.* at 459. This was important because Attorney Murphy subsequently represented Kohn during the post-indictment period. Thus, "Attorney Murphy's pre-indictment representation of Moss, and subsequent representation of Kohn, present[ed] the issue whether Attorney Murphy labored under an actual conflict of interest arising from these successive representations." *Id.* The *Moss* court first observed that "[i]t is more difficult for a defendant to show that counsel actively represented conflicting interests in cases of successive rather than simultaneous representation. *Id.* at 459-60 (citing cases). It then explained that "[t]he fear in successive representation cases is that the lawyer will fail to cross-examine the former client rigorously for fear of revealing or misusing privileged information. Thus, the most common example of an actual conflict of interest arising from successive representation occurs where an attorney's former client serves as a government witness against the attorney's current client at trial." *Id.* at 460 (internal citations omitted).

There is no claim of successive representation here; and thus, there can be no conflict-of-interest claim arising from the fear that Attorneys Crandall and/or Turner would not rigorously cross-examine a former client for fear of revealing or misusing privileged information.  Rather, here, there are claims that Attorneys Crandall and/or Turner labored under an actual conflict of interest arising from their joint representation of Defendants and other witnesses at pre-indictment proceedings before the grand jury.  And, the fear in joint representation cases is that the lawyer will find himself compelled to refrain from doing something he would otherwise do, i.e., engage in plea negotiations.  Even though there is no claim of successive representation here, the *Moss* court's analysis and application of the *Cuyler* two-prong test is instructive.

### (c) *Cuyler v. Sullivan* Two-Prong Test

In *Moss*, the Sixth Circuit first determined that defense counsel Murphy's "successive representation of Moss and Kohn in inextricably linked proceedings, coupled with evidence that Moss paid at least some part of Kohn's legal fees to [Kohn's defense counsel]," required application of the two-prong test announced by the Supreme Court in *Cuyler v. Sullivan*, 466 U.S. 335 (1980).  *Moss*, 323 F.3d at 463.  The Sixth Circuit then applied the two-prong *Cuyler* test.

### (1) Actual Conflict of Interest

As to the first prong – an actual conflict of interest – the Sixth Circuit considered whether Attorney Murphy's successive representations of Moss and Kohn created a conflict of interest.  *Id.* at 463.  It then explained the petitioners' burden:

> In order to demonstrate a conflict of interest under [*Cuyler v.*] *Sullivan*, the petitioners <u>must point to specific instances in the record that suggest an actual conflict or impairment of [their] interests</u>.  *Thomas*, 818 F.2d at 481 (internal

citations and quotations omitted).  They further "<u>must make a factual showing of inconsistent interests and demonstrate that the attorney made a choice between possible alternative courses of actions</u>, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other."  *Id.*  <u>However, if the conflict is</u> as to a matter that is irrelevant or the conflict is <u>merely hypothetical, there is no constitutional violation</u>.  *See Sullivan*, 446 U.S. at 350 ("[U]ntil a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance.").  *See also United States v. Hopkins*, 43 F.3d 1116 (6th Cir. 1995) (finding a hypothetical conflict where attorney simultaneously represented one client who provided information to the government inculpating another of the attorney's clients without the attorney's knowledge).

*Id.* at 463-64 (emphasis added).  Petitioners Moss and Kohn both argued that Attorney Murphy's "successive representations created a conflict of interest because Attorney Murphy's competing loyalties to Moss and Kohn impaired his ability to secure plea agreements requiring cooperation."  *Id.* at 464.  The government, however, had not extended plea offers to the petitioners; and thus, the Sixth Circuit reasoned that without a plea offer "it was impossible for Attorney Murphy to either reject or accept a plea as a result of divided loyalties to Moss and Kohn."  *Id.*

After examining relevant case law, however, the *Moss* court determined that "it is a reasonable expansion of prior precedent to hold that a conflict of interest arises where, as a result of joint representation of co-defendants, or successive representation of co-defendants in the same proceeding, defense counsel fails to explore <u>possible</u> plea negotiations."  *Id.* at 465 (emphasis added).  It then observed that the Supreme Court in *Holloway* established "an <u>express limitation</u> on conflict of interest claims where the claims are predicated upon defense counsel's failure to explore plea negotiations" – "such inaction may be proof of a conflict of interest" only if 'a lesser charge or a favorable sentencing recommendation would be acceptable.'"  *Id.* (quoting *Holloway*, 435 U. S. at 489-90)

52

(emphasis added).  Thus, the *Moss* court reasoned, "[a]t a minimum, *Holloway* requires a defendant alleging that his attorney's conflict of interest prevented the exploration of plea negotiations <u>to demonstrate that the government was willing to extend, or consider, an invitation to commence plea negotiations</u>."  *Id.* (emphasis added).  This is relevant to Defendants' arguments that Attorneys Crandall's and/or Turner's conflicts of interest prevented them from exploring or pursuing plea negotiations with the government.

In *Moss*, the Sixth Circuit determined that the petitioners had met their burden on the first prong of the *Cuyler* test.  It was "undisputed that the government was willing to negotiate a plea with Kohn," and Attorney Murphy's testimony at the evidentiary hearing revealed "that a conflict of interest arose between Attorney Murphy's successive representations of Moss and Kohn in that Attorney Murphy could not explore AUSA Janice's invitation to pursue [sic] plea negotiations on behalf of Kohn without breaching his duty of loyalty to Moss" because the government was requiring that Kohn cooperate against Moss.  *Id.*

Contrast the facts in *Moss* with those presented here.  At the June 3, 2014 evidentiary hearing, the parties stipulated that, during Crandall's and Turner's pre-indictment, pre-target representation of Defendants, the government did not offer to enter into plea negotiations.  When Stewart was identified as a target and represented by new counsel, Jeffrey Collins, however, the government did offer to enter into plea negotiations.  Stewart apparently declined to enter into a cooperation or plea agreement.  In fact, Stewart and Zajac had more than two years from the time they were represented by new, separate counsel (January 2011) until their indictment (March 2013) when new counsel could have, but did not negotiate a pre-indictment plea for them.

53

**(2) Adverse Affect**

As to the second prong – adverse effect –  the *Moss* court once again began by explaining the petitioners' burden.  "In order for Attorney Murphy's conflicts of interest to be of a constitutional magnitude, *[Cuyler v.*] *Sullivan* requires that the petitioners demonstrate that the successive representations adversely affected Attorney Murphy's performance."  *Id.*  Citing and quoting the Supreme Court's decision *Mickens*, 122 S. Ct. at 1243, the *Moss* court observed that "the petitioner specifically must demonstrate that the conflicts 'affected the counsel's performance, <u>as opposed to a mere theoretical division of loyalties</u>.'"  *Id.* at 465-66 (emphasis added).  "The showing must be that 'counsel was influenced in his basic strategic decisions by the interests [of the former client],' as where the conflict 'prevents an attorney . . . from arguing the relative involvement and culpability of his clients in order to minimize the culpability of one by emphasizing the other.'"  *Id.* at 466 (quoting *Wheat*, 486 U.S. at 160).[6]  The *Moss* court then examined the petitioners' separate arguments regarding adverse effect.

Petitioner Kohn argued that Attorney Murphy's successive representations "adversely affected" his counsel's "ability to explore plea negotiations because Attorney Murphy knew that any plea offer would require Kohn to testify against Moss."  *Id.* at 466.  Somewhat similar to Defendants' claims here, "Kohn specifically allege[d] that Attorney Murphy's failure to explore plea negotiations <u>precluded him from receiving a plea agreement similar to that received by [another indicted co-conspirator, Jaeger]</u>, which resulted in a sentence

---

[6]To the extent Defendants argue that *Hall v. United States*, 371 F.3d 969, 974 (7th Cir. 2004) holds otherwise, that argument is rejected.  *Hall* sets forth the Seventh Circuit's standard (announced despite a strong dissent by Judge Easterbrook), not the Sixth Circuit's standard as set out in *Moss.*

of thirty-six months, rather than the 188 month sentences that Kohn actually received." *Id.* (emphasis added). The district court rejected Kohn's argument, finding that "Attorney Murphy's unwillingness to explore plea negotiations did not derive from successive representations, but, rather, resulted from Kohn's desire to pursue a defense of innocence" and his unwillingness to testify against Moss. *Id.*

The *Moss* court further observed that the "causative language of [*Cuyler v.*] *Sullivan* requires that the defendant demonstrate a nexus between the conflict and the adverse effect on counsel's performance." *Id.* at 469. It then rejected Petitioner Kohn's additional claim that, because of Attorney Murphy's conflict of interest arising from his successive representations, Attorney Murphy provided erroneous advice regarding sentencing and this erroneous advice caused Kohn to fail to express a willingness to enter into a plea agreement. *Id.* at 467. The *Moss* court explained that "Kohn's claim fails because there lacks any nexus between Attorney Murphy's conflicted interests and the alleged erroneous advice regarding sentencing. Kohn merely alleges that Attorney Murphy had conflicting obligations and [he] provided erroneous advice regarding sentencing. Kohn fails to provide any specific and credible evidence linking Attorney Murphy's erroneous advice to the conflict of interest." *Id.* at 469.

The *Moss* court affirmed the district court, holding that petitioner Kohn had failed to "demonstrate that it was [his counsel]'s successive representations that adversely affected [his counsel]'s ability to enter into plea negotiations. Rather, the lack of plea negotiations in this case derived from Kohn's protestations of innocence, as well as Kohn's disinclination to testify against Moss in exchange for such an agreement. As such, Kohn failed to demonstrate the [his counsel]'s conflict of interest deprived him of his constitutionally

55

secured right to effective assistance of counsel." *Id.* at 470.

Petitioner Moss similarly argued that Attorney Murphy's successive representations adversely affected his representation of Moss because Attorney Murphy "failed to explore plea negotiations" with the government on his behalf. *Id.* at 470. The *Moss* court rejected Moss's conflict-of-interest ineffective assistance claim because "Attorney Murphy terminated his representation of Moss shortly after the arraignment," and Moss was not alleging that "Attorney Murphy's successive representations adversely affected" his representation during the time that Murphy served as Moss's counsel. *Id.*

### 3. Defendants Fail To Show Than An Actual Conflict of Interest Adversely Affected Crandall's or Turner's Pre-Indictment Representation of Them

#### (a) Defendants' Arguments

Defendants argue that there was an actual conflict of interest created by Crandall's and/or Turner's pre-indictment representation of them because (a) at the time they were representing Stewart and Zajac in connection with their testimony before the Grand Jury, they knew that Turner was also being investigated by that same Grand Jury for the same offense as Defendants; and (b) Crandall and Turner were simultaneously representing them and other Pension Board Trustees and staff who were witnesses before the Grand Jury. Defendants further argue that Crandall's and/or Turner's actual conflicts of interest adversely affected their pre-indictment representation.

#### (b) June 3, 2014 Evidentiary Hearing Re: Conflict Issues

At the evidentiary hearing, Stewart's and Zajac's counsel focused on when Crandall and Turner first learned that the January and August 2007 birthday parties were part of the

56

government's criminal investigation.  Turner testified that he knew that the birthday parties had come up during Grand Jury testimony, but he was not aware that the birthday parties were part of the government's investigation.  Turner testified that he did not recall when this topic was first discussed with the U.S. Attorney's Office, and does not recall telling Stewart that the government knew about the birthday parties.  Turner was not concerned about his attendance at those birthday parties.  He viewed them as just another fundraiser and not criminal activity.  For that reason, Turner did not believe his attendance at those birthday parties and his representation of Stewart, Bandemer, and Zajac along with lead counsel Crandall created an actual conflict that would adversely affect his pre-indictment representation of either Stewart of Zajac.  Turner testified that, before early January 2011 when Stewart, Zajac, and Bandemer were identified by the government as targets, he did not think that he had a conflict of interest with these three and thus did not take any action to protect himself.

Crandall testified that he was not sure when he first became aware of the birthday parties.  He was not sure if he knew about them before Stewart testified before the Grand Jury.  He testified that, in 2010, he knew that the government had concerns about the birthday parties, and he also thinks that he knew that Turner was at the parties.  Crandall concedes that he had a concern about this potential conflict and addressed this concern with the government.  Crandall does not recall if the conflict issue in connection with the birthday parties was specifically raised with Stewart, Zajac, and Bandemer, but conflict issues were raised with them from time to time.  Crandall testified that Zajac knew that Turner was at the birthday parties.  So did Stewart.  But, neither one of them ever complained that they did not want Turner involved in their representation because he too

57

might be a Grand Jury witness.

Crandall further testified that he spoke with his clients about potential conflicts, their right to separate counsel, as well as their right to waive any conflict, and that potential conflict issues were resolved thus allowing him to proceed forward with representation. Crandall was adamant in his testimony that he did not seek the September 28, 2010 proffer letter agreement for Stewart to protect Turner – that it had nothing to do with Turner. He testified that the thought never entered his mind because Crandall saw no conflict between Turner and Stewart. He was just trying to protect Stewart in light of the information Stewart provided to his counsel in their pre-Grand Jury interview with Stewart, i.e., testimony that Stewart had received something that he should not have because of his position on the PFRS Board. Again, Crandall clarified that he did not think Stewart's conduct constituted a bribe or a quid pro quo, but he thought Stewart needed the protection he would get from a proffer letter agreement. So, Crandall sought and obtained one from the government.

At the June 3, 2014 evidentiary hearing, the parties also stipulated that the government never offered to enter into plea negotiations when Stewart was not yet identified as a target and was represented by Crandall and Turner. They further stipulated that the government did, however, make such an offer when Stewart was identified as a target and was represented by Jeffrey Collins.

### (c) Court's Findings and Conclusions

The Court finds Attorneys Turner and Crandall to be credible and their testimony persuasive.

The Court rejects Defendants' arguments that an actual conflict of interest arose from Turner's representation of them before they were identified as targets in early January

58

2011.  In *Moss*, the Sixth Circuit rejected an argument similar to Defendants here – that Turner's alleged fear of being investigated by the government for the same offense as Defendants created a conflict of interest – because there is a lack of "any controlling authority to support the proposition that an attorney's fear of investigation may give rise to a conflict of interest."  *Moss*, 323 F.3d at 473.  Just like the petitioners in *Moss*, Defendants fail to come forward with any controlling authority supporting their proposition that an attorney's fear of investigation may give rise to a conflict of interest.

Moreover, Defendants failed at the evidentiary hearing to show that, during his pre-indictment representation of Zajac and Stewart, Turner ever feared that he was or would be investigated by the government.  Turner testified that he was never advised that he was a subject or target of the government's investigation that gave rise to Defendants' indictment.  Rather, he was called to testify before the Grand Jury as a fact witness months <u>after</u> the government identified Stewart, Zajac, and Bandemer as targets and he and Crandall had already terminated their representation.  Turner testified that he was never concerned about his attendance at the birthday parties because he considered them to be just another fundraiser, not criminal activity.  Accordingly, he was not concerned about the contributions he made and took no actions to protect himself at the expense of his clients.  Further, as Crandall testified, the entire time that he and Turner represented Stewart and Zajac, neither one said that Turner could not be involved because he might be a witness.

Crandall also testified that he did not seek a proffer letter agreement for Stewart to protect Turner.  He emphasized that it had nothing to do with Turner.  Rather, he had obtained some information from Stewart at his pre-Grand Jury interview that concerned Crandall.  So, he sought and obtained the proffer letter agreement from the government to

protect Stewart.

The Court also rejects Zajac's and Stewart's arguments that an actual conflict of interest arose from Crandall's and/or Turner's joint or simultaneous representation of them and other Pension Board Trustees and staff at the pre-indictment stage. As the Sixth Circuit observed in *Thomas*, "[j]oint representation of codefendants does not per se constitute ineffective assistance of counsel due to a conflict of interest." *Thomas*, 818 at 481. Rather, "[t]he standard for determining whether an actual conflict of interest exists" requires the defendant to "make a factual showing of inconsistent interests and <u>must demonstrate that the attorney made a choice between possible alternative courses of action</u>, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to another. <u>If he did not make such a choice, the conflict remained hypothetical. . . . There is no violation where the conflict is irrelevant or merely hypothetical; there must be an actual significant conflict</u>." *Id.* at 481 (internal quotation marks and citations omitted) (emphasis added).

Even if Defendants did establish that an actual conflict of interest arose from Attorney's Crandall's and Turner's joint representation or Turner's being the subject or target of the Grand Jury's investigation, the Court finds that they failed to show that these conflicts of interest adversely affected either Crandall's or Turner's pre-indictment representation of them. Defendants claimed that they could establish that the above conflicts of interest caused Crandall and/or Turner to refrain from:

(a) obtaining the same deal for Stewart or Zajac that they got for Bandemer,

(b) informing Stewart and Zajac that they had the right to exercise their Fifth Amendment right not to incriminate themselves in testimony before the Grand Jury and that they should invoke that privilege until offered full *Kastigar* immunity protections rather than

sign the less-protective proffer letter agreements that they did sign,

       (c) pursuing negotiations with the government that could have resulted in Stewart and Zajac preserving their right to full *Kastigar* immunity protections before testifying before the Grand Jury and instead counseled Stewart and Zajac to sign the proffer letter agreement, and

       (d) pursuing plea negotiations with the government where Stewart or Zajac would offer to cooperate and testify against other Crandall/Turner clients.

Each of these arguments has obvious flaws. First, as discussed above, there is no constitutional right to conflict-free pre-indictment counsel. Even if there were, Defendants' arguments and proof fail for the following reasons.

Considering (a) and (d) above, Defendants argue that Attorneys Crandall's and Turner's multiple representation of witnesses before the grand jury and/or Attorney Turner's fear of being investigated by the government on the same charges as Defendants adversely affected their pre-indictment counsel's ability to explore or pursue plea negotiations with the government and/or their ability to get the same deal for Defendants that Bandemer got from the government. *See, e.g., Moss*, 323 F.3d at 468. These arguments lack factual and legal support. First, as to plea negotiations, it is undisputed that Attorneys Crandall's and Turner's representation of Stewart and Zajac ended at the pre-indictment stage (January 2011) once they were identified as targets of the government's investigation. It is also undisputed that, during the pre-indictment, pre-target time period that Crandall and Turner represented Zajac and Stewart, the government never offered to enter into plea negotiations. Thus, Defendants cannot show that Crandall's or Turner's failure to pursue plea negotiations with the government derived from a conflict of interest.

It is also undisputed that once Stewart was identified as a target and had retained

61

new, separate counsel (Jeffrey Collins), the government did offer to enter into plea negotiations.  Moreover, as discussed above, new counsel for Zajac and Stewart had over two years to enter into plea negotiations with the government before they were indicted (March 2013).  This afforded Stewart's and Zajac's new counsel plenty of time to negotiate with the government to get a pre-indictment plea or cooperation agreement.

Moreover, as the government persuasively argues, Stewart's inability to obtain the same deal from the government as Bandemer arises from his decision not to be fully truthful in his September 2010 grand jury testimony about money he got from Shumake, the investment sponsor on the ICG Leaseback deal being considered by the Pension Boards.  Zajac's inability to obtain the same deal as Bandemer similarly arises from his decision not to be fully truthful in his September 2010 grand jury testimony.  As the government stressed at the evidentiary hearing, truthfulness in earlier testimony and interviews is a key component of being able to negotiate with the government, and a proffer letter agreement is generally a prelude to a cooperation agreement.  Indeed, Crandall testified that he sought and obtained a proffer letter agreement for several witness, like Seth Doyle and James Moore, who were not indicted.

Even if Defendants had a Sixth Amendment right to counsel and a derivative claim for ineffective assistance of counsel for their counsel's pre-indictment representation (which they do not), they fall far short of demonstrating (as they must) that Crandall and/or Turner, during their pre-indictment representation, actively represented conflicting interests that adversely affected their pre-indictment assistance of counsel.  Stewart offers only speculation about negotiations that "could have benefitted" him (Stewart Br. at 3), that "may have" placed him in a better position (*id.* at 20), and that "might have" resulted in his

62

providing some unspecified information against Attorney Turner and others (*id.* at 21) but for his pre-indictment representation by Turner and Crandall. Like Stewart, Zajac also fails to demonstrate that either Turner or Crandall actively represented conflicting interests that adversely affected their effective pre-indictment representation of Zajac. Rather, like Stewart, Zajac merely offers speculation and conjecture.

Considering (b) and (c) above, Defendants argue that Attorneys Crandall's and/or Turner's conflicts of interest and divided loyalties (arising from their multiple representation of Pension Board witnesses and staff and Attorney Turner's fear of being investigated by the government) adversely affected their counsel's duty to inform them that they had a Fifth Amendment right to refuse to testify before the grand jury and to advise them that they should exercise that Fifth Amendment right and hold out until the government offered them full *Kastigar* use and derivative use immunity rather than advising them to enter into the less protective proffer letter agreements that they entered into prior to their grand jury testimony. These arguments fail for the following reasons.

Both Crandall and Turner conceded that they never sought full statutory use and derivative use (*Kastigar*) immunity for Zajac, Stewart, or Bandemer. Likewise, there is no evidence that they advised Stewart or Zajac to assert their Fifth Amendment privilege against self-incrimination as a bargaining tool before agreeing to testify before the Grand Jury to pressure the government to provide them with full statutory use and derivative use immunity. And, Crandall and Turner admitted that they were aware that a conflict of interest would arise from their joint representation if they did so – if full use immunity was obtained for one client, then that client would be able to freely testify against another.

Although Crandall and Turner made these concessions, Defendants have not

63

established that the government would have offered them full *Kastigar* use and derivative use immunity rather than the proffer letter agreements they signed.  As the government explained and Crandall conceded, if a witness will not testify before the Grand Jury, the government can obtain an ex parte compulsion order.  Moreover, if a witness or target requires the U.S. Attorney's Office to get a compulsion order, then it is less likely that the witness or target will obtain a cooperation or plea deal from the government.  Defendants merely offer speculation and conjecture to support the argument that Turner's and/or Crandall's conflicts of interest caused them to refrain from seeking and obtaining full statutory use and derivative use immunity from the government.  Speculation, however, is not enough to satisfy the second prong of the *Cuyler* test.  Citing and quoting the Supreme Court's decision in *Mickens*, 122 S. Ct. 1243, the *Moss* court observed that "the petitioner specifically must demonstrate that the conflicts 'affected the counsel's performance, as opposed to a mere theoretical division of loyalties.'" *Moss*, 323 F.3d at 465-66.

Defendants have not shown that, as a result of conflicts of interest, Crandall and/or Turner deliberately choose to refrain from pursuing full statutory immunity rather than relying on Defendants' assurances that they would be completely truthful in their Grand Jury testimony; that they deliberately chose to protect their own interests over their client's and thus sought the proffer letter agreements – agreements that would have protected Defendants had they been fully truthful in their Grand Jury testimony.  As Crandall testified, as a defense attorney, he has represented hundreds of grand jury witnesses.  If he determines that there is sensitive, incriminating evidence at issue, his goal is to offer cooperation for the exchange of some protections.  To obtain that protection, the witness must tell the government all he knows.  Crandall informs the witness of that requirement.

64

He then seeks a proffer letter agreement as a prelude to a cooperation agreement. And, that is what was done here.

Defendants cannot establish that their counsel's alleged failures caused the dilemma they now face, i.e., the government's ability to use their testimony at trial. Rather, it arises from their own decision not to be fully truthful in their September 2010 grand jury testimony. There is no evidence that Defendants' pre-indictment counsel advised them to lie or to withhold information so as to protect other client/witnesses or Attorney Turner from criminal liability or criminal investigation. Rather, the evidence is to the contrary. There is no evidence that Attorneys Turner or Crandall counseled Defendants Stewart or Zajac not to testify before the grand jury so as to protect Attorney Turner or their other client/witnesses. In fact, Defendant Stewart did testify that Attorney Turner was present at the August 2007 birthday party for Stewart and Bandemer and that he likely contributed money that ultimately went to Stewart and Bandemer.

Before they testified before the grand jury, Defendants admitted that they understood that they had a right not to answer questions, that they reviewed the terms of their proffer letter agreements with their counsel before they signed them, and that they understood all of the terms of the proffer agreement. Moreover, despite Stewart's claim that he was never informed of his Fifth Amendment right to remain silent before the Grand Jury, the transcript of his Grand Jury testimony proves otherwise. At the outset of his appearance, Stewart confirmed that he understood his Fifth Amendment right not to incriminate himself:

> Q: You understand that you have a right not to answer any question that you honestly believe may tend to incriminate you or show that you're guilty of a crime. Do you understand?
>
> A: Yes, sir.

(Grand Jury Tr. at 3, Paul Stewart testimony, Sept. 29, 2010.)

Defendant Stewart also confirmed that he understood the terms of his September 28, 2010 proffer letter agreement:

> Q: . . . before you signed that, did you go over the terms of that agreement with your attorneys?
>
> A: I did.
>
> Q: And when you signed it, did you understand all of the terms of the agreement?
>
> A: I did.

(*Id.* at 3-4.)  Moreover, Defendant Stewart was informed on September 29, 2010 that he had a right to consult with his attorneys outside the Grand Jury room upon request.  (*Id.* at 4.)

The same is true for Defendant Zajac.  Although Zajac, an experienced attorney, argues that he was not adequately counseled regarding his rights under the Fifth Amendment or the terms of his September 2010 proffer letter agreement, the transcript of his Grand Jury testimony proves otherwise.  At the outset of his first appearance before the Grand Jury on September 8, 2010, the following colloquy took place between the government's counsel and Zajac:

> Q: Mr. Zajac, you are appearing before a duly impaneled Federal Grand Jury.  They have the duty and responsibility to investigate possible violations of federal law.
>
> The testimony you are about to give is under oath.  That means that if you testify falsely or omit a material fact, you are subjecting yourself to possible prosecution for perjury or making a false statement to the Grand Jury.
>
> Do you understand?

66

A:   Yes.

Q:   Those are crimes punishable by terms of imprisonment of up to five years and/or a fine of up [to] $250,000.

Under normal circumstances, anything you say could be used against you.  But do you understand that through your attorney, Mr. Martin Crandall, you and your attorney have entered into an agreement with our office, regarding your testimony here today?

A:   Yes.

Q:   That was formalized in a letter, which is dated September 3, 2010.  I have a copy of that.  That bears your signature; is that correct?

A:   Yes.

Q:   You have gone over that letter with your attorney?

A:   I have.

Q:   You yourself are an attorney?

A:   Pardon me?

Q:   You yourself are an attorney?

A:   I am.

Q:   Do you understand the full extent of the protections of that letter?

A:   Yes.

Q:   You understand that as long as you testify truthfully, whatever you say will not be used against you?

A:   Yes.

Q:   But, of course, if you testify untruthfully or omit a material fact, then that opens up the door for the use of your testimony.  Do you understand that?

A:   Yes, I do.

Q:   Do you also [sic] that anything any derivative – you understand derivative

evidence?

A:  Yes.

Q:  That evidence derived from your statements today could be used against you?

A:  Yes.

Q:  Do you have any questions about your rights and responsibilities?

A:  No.

(Gov't Zajac Resp., Ex. A, Grand Jury Tr. at 2-4, Robert Zajac testimony, September 8, 2010.)  Defendant Zajac was also informed that he had a right to consult with his attorneys outside the Grand Jury room upon request.  (*Id.* at 4-5.)

It is "well-established that the Fifth Amendment privilege against self-incrimination extends to grand jury proceedings." *United States v. Myers*, 123 F.3d at 359.  Defendants were informed of their Fifth Amendment privilege, but failed to invoke it.  It is their duty to do so.  *See United States v. Fromin*, 540 F.2d 846, 849 (6th Cir. 1976) (observing that "[i]t is the duty and right of such [grand jury] witness to invoke the privilege against self-incrimination and refuse to answer questions").  *See also Radford*, 2000 WL 1137712 at *4 (observing that "the privilege is normally self-executing") (citing cases).

To the extent that Defendants are arguing that they did not knowingly and intelligently waive their Fifth Amendment privilege, that argument cannot withstand scrutiny.  When evaluating this argument, the Court must consider the "totality of the circumstances." *Fowler*, 535 F.3d at 416.  These "circumstances" include Defendants' Grand Jury testimony that they understood their Fifth Amendment rights, the fact that they did not invoke them during that testimony, and the fact that Stewart is a 25-year veteran with the Detroit Police

Department and Defendant Zajac is an experienced attorney and thus both likely have greater familiarity with these rights than others.

## III.   Conclusion

For the above-stated reasons, Defendant Stewart's and Zajac's motions to dismiss based on an alleged conflict of interest are DENIED.


s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  June 12, 2014

I hereby certify that a copy of the foregoing document was served upon counsel of record on June 12, 2014, by electronic and/or ordinary mail.

s/Carol J. Bethel
Case Manager